# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

**F I L E D**

JUL 15 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY GOLDEN<br><br>*Pro Se* Plaintiff,<br><br>V.<br><br>APPLE INC.<br><br>Defendant. | CASE NO: **22   04152** VKD<br><br>**(JURY TRIAL DEMANDED)**<br><br>**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Willful Patent Infringement).**<br><br>July 12, 2022 |

## COMPLAINT FOR ANTITRUST LAW VIOLATIONS AND PATENT INFRINGEMENT

This is a civil action brought under Antitrust Law violations commencing from competitor collaborations while performing work for the Government; conspiracy to restrain trade while performing work for the Government; exclusive dealings arrangements while performing work for the Government; unreasonably restraining competition by creating and

maintaining monopoly power while performing work for the Government, that likely resulted in secret conspiracies and the anticompetitive practices alleged in this complaint.

This action is also brought under direct infringement; infringement under the "doctrine of equivalents; indirect infringement; and contributory infringement commencing from 35 U.S.C. § 271 (a) … "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent. (b) [w]hoever actively induces infringement of a patent shall be liable as an infringer. (c) [w]hoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

This action is for damages and injunctive relief on behalf of the Plaintiff, against the defendant Apple Inc. ("Apple"); demanding a trial by jury, complains and alleges as follows:

## NATURE OF THE CASE

1.     This enforcement action challenges Apple's unlawful maintenance of a monopoly. Apple has engaged in exclusionary conduct that reduces competitors' ability and incentive to innovate, and raises prices paid by consumers for the new and improved cell phones, smartphones, laptops, tablets (iPads), and smartwatches. Apple is a dominant supplier of new and improved cell phones, smartphones, laptops, tablets (iPads), and smartwatches.

2.      Apple has excluded competitors and harmed competition through interrelated policies and practices that includes conspiracy to restrain trade, exclusive dealing agreements, and attempted monopolization.

3.      Apple's conduct has harmed competition and the competitive process. At a time when mobile technologies are expanding to new and varied applications, Apple's practices threaten further consumer harm in an industry in which competition is vitally important.

4.      The most egregious infringer is the willful infringer. The Circuit Court has identified two prongs to determine willful infringement: 1) "clear and convincing evidence that the infringer [Apple Inc.] acted despite an objectively high likelihood that its actions constituted infringement of a valid patent(s)," and 2) a subjective prong that the infringer [Apple Inc.]  knew or should have known it was acting recklessly.  Apple should be required to compensate the patentee [Plaintiff] and suffer punitive damages. Under this proposed model for relief, the patentee [Plaintiff] would recover actual damages (lost profit and transaction costs), restitution for the unjust enrichment Apple gained by unfairly using the patents, and, under the court's discretion, treble damages as currently authorized by statute.

5.      The Clayton Act authorizes Plaintiff to sue for triple damages when Plaintiff have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

## JURISDICTION AND VENUE

6.      This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover triple damages, injunctive relief, and costs of suit; for violation of Section 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2; conspiracy in the restraint of trade and single-firm violations).

7.      This Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

8.      Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because defendant reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

9.      For patent litigation cases, the venue statute, 28 U.S.C. §1400(b), provides "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."

10.      The activities of the Defendant, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

**Intradistrict Assignment**

11.      Assignment to the San Jose Division is proper. The actions arose in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County. Apple has offices in Santa Clara and San Jose. Third parties that have information relevant to this action, including leading cell phone manufacturers (also known as "original equipment manufacturers" or "OEMs") and Apple's competitors, also have offices in Santa Clara County.

**Related Case Dismissed "Without Prejudice"—Antitrust Law Violations**

12.      UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT No. 21-2160 *Larry Golden*, on behalf of himself and all others similarly situated, Plaintiff -

Appellant, *v. Apple, Inc.; Samsung Electronics USA; Lg Electronics USA, Inc.; Qualcomm Inc.; Ford Global Technologies LLC; General Motors Company; FCA US, LLC*, Defendants - Appellees. USCA4 Appeal: 21-2160 Doc: 7 Filed: 03/31/2022

13.     "PER CURIAM: Larry Golden appeals the district court's order accepting the recommendation of the magistrate judge and <u>dismissing without prejudice</u> Golden's civil complaint. We have reviewed the record and find no reversible error. Accordingly, we affirm the district court's order." *Golden v. Apple, Inc.*, No. 6:20-cv-02270-JD (D.S.C. Sept. 20, 2021) ...

**Related Case Dismissed "Without Prejudice"—Patent Infringement**

14.     IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA GREENVILLE DIVISION *Larry Golden, Plaintiff, vs. Apple Inc.; Samsung Electronics USA; LG Electronics USA, Inc.; Qualcomm Inc., Motorola Solutions, Inc.; Panasonic Corporation; AT&T Inc.; Verizon Corporation Service Group; Sprint Corporation; T-Mobile USA, Inc.; Ford Global Technologies, LLC; Fairway Ford Lincoln of Greenville; General Motors Company; Kevin Whitaker Chevrolet; FCA US LLC; Big 'O' Dodge Chrysler Jeep Ram, Defendants*. Case No.: 6:20-cv-04353-JD-KFM Date Filed 11/02/21 Entry No. 26.

15.     "Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report and Recommendation as modified and incorporates it herein. IT IS, THEREFORE, ORDERED that Plaintiff's Complaint is <u>dismissed without prejudice</u> and without the issuance of service of process."

**Dismissal "Without Prejudice"**

16.     When a court dismisses a claim but leaves the plaintiff free to bring a subsequent suit based on the same grounds as the dismissed claim. *In Semtek Intern. Inc. v. Lockheed Martin Corp.*, the Supreme Court pointed out that one of the main features of dismissal without

prejudice is that it does not prevent refiling of the claim... "a case that is dismissed "without prejudice" is only dismissed temporarily. This temporary dismissal means that the plaintiff is allowed to re-file charges, alter the claim, or bring the case to another court."

## RELATED CASE

17.     Plaintiff has an Antitrust case pending in the United States District Court for the Northern District of California (Oakland); *Golden v. Qualcomm, Inc.*; Case No.: 4:22-cv-03283-KAW; Kandis A. Westmore is the Presiding Magistrate Judge. The cases are very similar in nature because Apple and Qualcomm were both notified in 2010 of Plaintiff's offer to license Plaintiff's intellectual property; both have had additional opportunities to enter into licensing agreements; both have formed or maintained a monopoly by either using, making, offering for sale, or selling Plaintiff's patented inventions; both have negotiated exclusive agreements; both received a benefit from the Plaintiff; and, both were unjustly enriched at the Plaintiff's expense. The term "benefit" means any type of advantage. (*Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 347.) receipt of a benefit and unjust retention of the benefit at the expense of another." (*Lyles v. Sangadeo-Patel* (2014) 225 Cal.App.4th 759, 769.)

## THE PARTIES

18.     Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business (ATPG Technology, LLC), and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607. Plaintiff is the author of three economic stimulus packages submitted to Government beginning in year 2003. The success of the packages was dependent on the development of certain intellectual property technology that is owned by the Plaintiff, and is asserted in this case (i.e., Communicating, Monitoring, Detecting, and Controlling (CMDC) devices; Central

Processing Units (CPUs) for New and Improved Cell Phones; and, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS).

19.     On information and belief, Apple is a California corporation with a principal place of business at One Apple Park Way, Cupertino, CA 95014 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint.

20.     Apple's unjust enrichment of profits, resulting from a violation of antitrust laws; anticompetitive practices; conspiracy in restraint of trade; direct infringement; and contributory infringement, give rise to this complaint. Apple's monopolization and attempted monopolization violations require no agreement as Section 1 violations do. *E.g., Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993) (explaining that "while § 1 . . . forbids contracts or conspiracies . . ., § 2 addresses the actions of single firms that monopolize or attempt to monopolize"). They are "single-firm" violations.

21.     Apple's total revenue between the years 2011 and 2021: https://www.macrotrends.net/stocks/charts/AAPL/apple/revenue

**Apple Annual Revenue**

| | |
|---|---|
| 2021 | $365.8B |
| 2020 | $274.5B |
| 2019 | $260.2B |
| 2018 | $265.6B |
| 2017 | $229.2B |
| 2016 | $215.6B |
| 2015 | $233.7B |
| 2014 | $182.8B |

| Apple Annual Revenue | |
|---|---|
| 2013 | $170.9B |
| 2012 | $156.5B |
| 2011 | $108.2B |

22.     Apple may be served at its principal place of business at One Apple Park Way, Cupertino, CA 95014.

## STATEMENT OF FACTS:

## RELEVANT HISTORICAL FACTUAL ALLEGATIONS TO SUPPORT PLAINTIFF'S CLAIM OF APPLE'S ANTICOMPETITIVE CONDUCT

23.     "Months after the company fought a tense legal battle with the FBI over iPhone security, the Democratic leader in the U.S. House of Representatives is questioning how much credit Apple should get for creating the iPhone. In comments this week [June 10, 2016], Rep. Nancy Pelosi (D-Calif.) said "federal research" -- not Steve Jobs or Apple -- invented the iPhone … Pelosi said: '[a]nybody here have a smartphone? In this smartphone, almost everything came from federal investments and research. GPS, created by the military, flatscreens, LLD [sic], digital camera, wireless data compression, research into metal alloys for strength and lightweight, voice recognition -- the list goes on and on' … What Pelosi seems to be saying was that federal funding and research played a key role in many of the underlying technologies within the iPhone, which is true. As just one example, the U.S. military developed GPS technology [the first iPhone was released on June 29, 2007; the first GPS chip was added to the iPhone 3G in 2008], which powers much of the location-based data that's fundamental to smartphones today" https://mashable.com/article/nancy-pelosi-iphone-invent

24.    "Today, chances are your cell phone is called a "smartphone" and came with a three-to-five-megapixel lens built-in [the built-in camera lens are used for detecting C/B/R agents] says Stephen Dennis, Cell-All's program manager … **(Exhibit A)**. In 2007, S&T called upon the private sector to develop concepts of operations … three teams from Qualcomm, NASA, and Rhevision Technology [Rhevision: developed the built-in megapixel camera lens for detecting C/B/R agents] are perfecting their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market … S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes" Cell-*All: Super Smartphones Sniff Out Suspicious Substances*. https://www.dhs.gov/ science-and-technology/cell-all-super-smartphones-sniff-out-suspicious-substances

25.    Under the DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, the third-party contractors were given "consent and authorization" to private parties' infringement, *Sheridan v. United States*, 120 Fed. CL at 131, to develop and assemble under the *Cell-All* initiative, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) device (i.e., new and improved cell phone), according to the following:

❖ Plaintiff's patented chemical, biological, explosive, or radiological sensors and detectors [contractors: Qualcomm; Rhevision; Seacoast Science; NASA—Genel; Synkera]
❖ Plaintiff's patented new and improved cell phones [contractors: Qualcomm; Apple; Samsung; LG]
❖ Plaintiff's patented central processing units (CPUs) [contractor: Qualcomm]
❖ Qualcomm's patented wireless cellular modems [contractor: Qualcomm]

❖ AT&T's communication systems concept for large scale ubiquitous networks [subcontractor to Apple: AT&T] 28 U.S.C. § 1498(a) ... "[f]or the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."

❖ Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) device (i.e., new and improved cell phone; smartphone, developed and assembled under the *Cell-All* initiative) include certain safety features to protect the public. These features are: biometric authentication, disabling lock after multiple fail attempts to unlock, radio-frequency near-field communication, and location tracking [contractors and subcontractor: Apple, Qualcomm, and AT&T]

26.    Apple and Qualcomm conspired to monopolized the smartphone industry. According to Mr. Hoffman, "[e]nrolling members of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: 'Let's take advantage of the 300 million cell phones that are out there today. They're always with us'" (Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28 <http://cellall. webcaston.tv/ home/homepage.php> (accessed 17.09.12))

27.    "Apple has been indirectly paying Qualcomm licensing fees since 2007, when it released the iPhone. Qualcomm required licensing fees for using its chipsets. Rather than grant Apple a direct license on FRAND terms, Qualcomm has instead entered into confidential licenses with specific Apple contract manufacturers ("CMs"), the third-party manufacturers who make and assemble Apple products. The CMs pay the exorbitant royalties Qualcomm demands and pass the costs along to Apple in full ... Since at least 2007, Qualcomm has engaged in

systematic, continuous conduct to exclude competition in the relevant chipset markets.

https://www.fool. com/investing/2017/01/28/the-chronological-history-of-how-qualcomm-

became-t.aspx

28.    2011: Apple launches the iPhone on Verizon, and Qualcomm's exclusivity

begins. This was the year that Apple fully got into bed with Qualcomm, largely because

Verizon's 3G network uses CDMA instead of GSM. As the largest U.S. carrier, it was an

important strategic move for Apple ahead of the scheduled end of AT&T exclusivity. Fully

aware of this, Qualcomm flexed its licensing muscles ... Apple became even more reliant on

Qualcomm in 2011 due to Apple's desire to release an iPhone that could connect to CDMA

networks, such as Verizon's ... Since 2011, when Apple introduced the first CDMA version of

its products, Qualcomm has charged Apple a monopolistic premium for access to CDMA

chipsets". The Northern District of California in *Federal Trade Commission v. Qualcomm Inc.*

29.    Apple and AT&T conspired to monopolized the smartphone industry. "Apple, in

a court filing (Northern District of California) in October 2008, admitted that AT&T had

*exclusive distribution* rights in the U.S. for the iPhone. Apple specifically admitted to reports

from *USA Today* in 2007, in which the newspaper said that the two companies had agreed to a

deal through 2012 ... a class-action lawsuit filed in 2007, accusing both the iPhone maker and

AT&T of illegally exerting a monopoly over iPhone customers" https://appleinsider.com/

articles/10/05/10/apple_att_originally_agreed_to_ iphone_exclusivity_until_2012

30.    "Apple wanted a partner that would be ready to give it a percentage of the annual

service bill for iPhone users and at the same time, Apple didn't want to provide long term

exclusivity to any one carrier. AT&T, automatically, became the prime candidate since it had the

largest wireless data network available at that time which reached 270 million people worldwide.

On the other side, AT&T was looking for a competitive advantage in the wireless market and to fully transition its brand into that of a wireless company. The details of the Apple and AT&T deal was a very secret affair but a number of them were released publicly. Main points of the deal are summarized below:

❖ AT&T would be the exclusive carrier of the iPhone for 5 years while Apple would get millions of dollars from AT&T to support the development of the iPhone.

❖ AT&T would get 10% of iPhone sales in AT&T stores while Apple would get $10 a month of AT&T iPhone subscriber's bill.

❖ AT&T would get a thin slice of iTunes revenues while Apple would get control of design, manufacturing, marketing.

It was predicted by the Analyst that the iPhone would sell about 8 million units by the end of 2008, but in reality, the number was much larger. The actual sale was 1.4 million units globally in 2007 and from 2008-2011 the number of units sold increased from 11.6 to 72.3 million. Apple's sales jumped from $19 billion to $156 billion in just six years from 2006 to 2012 and its market value skyrocketed from $56 billion to $494 billion during that same period. https://blog.ipleaders.in/key-features-apples-deal-att-selling-iphones/

31.    "On December 14, 2015 Judge Yvonne Gonzalez Rogers heard oral argument on a motion to dismiss filed by Apple in an antitrust action brought against the company in connection with its 2007 deal to sell iPhones exclusively to AT&T Mobility.  The next day, Judge Rogers denied Apple's motion.  The lawsuit, one of several arising from the Apple-AT&T agreement, raises interesting questions about how to define a relevant product market using an "aftermarket" theory.  *Ward v. Apple, Inc.* was first filed in the Northern District of California in 2012.  The plaintiffs sought to represent a putative class of consumers who bought iPhones while the exclusivity agreement between Apple and AT&T was in effect.  This exclusivity agreement

made AT&T the only authorized provider of voice and data services for the iPhone, and was enforced through the installation of a "software lock" that made it impossible for consumers to use their iPhones on a different network. The agreement, entered into shortly before the iPhone's debut in 2007, was set to last for five years, meaning the first purchasers of iPhones had unwittingly (according to the plaintiffs) agreed to use only AT&T's voice and data services for the next five years if they wished to use their iPhones. Crucially, Apple and AT&T shared the profits from the services contracts, a novel arrangement between a services provider and a phone manufacturer. Plaintiffs allege that this agreement allowed Apple and AT&T to dominate the "iPhone Voice and Data Services Aftermarket" and charge supercompetitive prices in that market." https://www.pbwt.com/antitrust-update-blog/second-bite-at-the-apple-in-at-t-aftermarket-case

32.     As demonstrated in this section, Plaintiff believes Apple is in violation of Section 1 of the Sherman Act whereby Apple's conspiracy comprised of agreements, and an understanding or meeting of the minds between at least the two competitors named in the *Cell-All* initiative [Samsung and LG], or potential competitor named in the *Cell-All* initiative [Qualcomm], for the purpose of conspiring or with the effect of unreasonably restraining trade.

33.     Also, as demonstrated in this section, Plaintiff believes Apple is in violation of Section 2 of the Sherman Act whereby Apple has attempted to monopolize; and, combined or conspired with Qualcomm [attempted target is 300 million people with smartphones] and AT&T [network of 270 million people worldwide] to monopolize the smartphone industry among the several States, and with foreign nations. . . 15 U.S.C. § 2 (2000). Section 2 proscribes "attempt[s] to monopolize": [a]ttempted monopolization requires (1) anticompetitive conduct, (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power 15 U.S.C. §

2 (2000). Section 2 prohibits maintaining monopoly power only through improper means [making, using, offering for sale, or selling the patented products of the Plaintiff without a license or authorization] *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *United States v. Grinnell*, 384 U.S. 563, 57071 (1966).

## APPLE'S MOTIVE TO FORM A CONSPIRACY, AND APPLE'S CONSPIRACY IN RESTRAINT OF TRADE

34.     Apple's motive to conspire means that the relevant market was conducive to "collusion" due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are, by nature, more conducive to collusion.

35.     Upon information and belief, Apple has conspired with Qualcomm, Samsung, & LG; who participated as co-conspirators with Apple in violating certain antitrust laws, and laws governing the unauthorized use of Plaintiff's patented inventions.

36.     After the 9/11 bombings and beginning in year 2003, Plaintiff submitted to all 50 U.S. Senators three "Economic Stimulus and Terrorism Prevention Packages" [The "SafeRack" Stimulus Package; the "ATPG" Stimulus Package; and, the "V-Tection" Stimulus Package]. Each package described specific technology needed to institute or set in motion the strategies for restoring our Nation's economy.

37.     The "product grouping" strategy for the "Anti-Terrorism Product Groupings (ATPG) Package, is to design a device(s) that is capable of communicating with the detection and monitoring devices of the "SafeRack Package"; and, capable of controlling the activation and deactivation of certain products of the "V-Tection Package" (e.g., locks, vehicles, etc.).

38.     The technical rational for the "ATPG" Stimulus Package is to design a device that is capable of communicating, monitoring, detecting, and controlling (CMDC). Plaintiff has in the

past, and will throughout this document show Apple's smartphones, tablets, laptops, and smartwatches are designed after Plaintiff's CMDC devices.

39.    Plaintiff's stimulus packages were sent to two offices of the executive branch of Government; the Office of the President (Bush), and the Office of the Vice-President (Cheney), that included the technical rational for a communicating, monitoring, detecting, and controlling (CMDC) device. They sent the packages to the Department of Homeland Security (DHS).

40.    Three United States Senators for the State of South Carolina (Graham, Holland, and DeMint), were sent Plaintiff's stimulus packages that included the technical rational for a communicating, monitoring, detecting, and controlling (CMDC) device.  They sent the packages to the Department of Homeland Security (DHS).

41.    Plaintiff received two invites from the Department of Homeland Security. DHS invited Plaintiff to the Department to discuss Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices.

42.    In 2007, Apple and the Plaintiff was competing for the same government contract. The Department of Homeland Security (DHS) issued a 'request for proposal' [DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing*]. DHS was seeking proposals for a new and improved cell phone capable of biological and chemical sensing.

43.    For the program's initial phase in 2007, DHS released a call for proposals inviting the private sector to develop a proof of concept for the "*Cell-All Ubiquitous Biological and Chemical Sensing*" project (U.S. Department of Homeland Security, 2007). Cell-All Ubiquitous Biological and Chemical Sensing. <https://http://www.fbo.gov/index?s=opportunity&mode= form&id =f292c1fdbd46777a3ff8ca64ef96658f&tab=core&_cview=1> (accessed 17.09.12).

44.     DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010, Cell-All: Super Smartphones Sniff Out Suspicious Substances <http://www.dhs.gov/cell-all-super-smartphones-sniff-out-suspicious-substances> (accessed 17.09.12)).

45.     Plaintiff believes there were three motives for Apple and its co-conspirators Qualcomm, Samsung, & LG to conspire to keep Plaintiff's entrance into the market restrained. First, Apple and its co-conspirators knew the Department of Homeland Security had issued a solicitation for a new, useful, and improved upon cell phone. According to the USPTO, a new, useful, and improved upon product (i.e., cell phone) is patentable. Neither Apple or any of its co-conspirators held the patent for a new and improved cell phone. Plaintiff believes Apple and its co-conspirators Qualcomm, Samsung, & LG agreed to develop the new, useful, and improved upon cell phone, under the premise that none of the conspirators would ever file for a patent for the new and improved cell phone; none would market themselves as the inventor of the new and improved cell phone; and, none would accept a license from the Plaintiff for the new and improved cell phone.

46.     Second motive to conspire: Apple and its co-conspirators Qualcomm, Samsung, & LG knew they were free from liability of infringement if they performed the work under a government contract. Plaintiff believe Apple and its co-conspirators Qualcomm, Samsung, & LG knew that with "authorization and consent" from the government, they were immune from the liability of infringing Plaintiff's inventions. They also knew that if Plaintiff decides to bring an action, it must be brought against the government in the Court of Federal Claims.

47.     Third motive to conspire: Apple and its co-conspirators Qualcomm, Samsung, & LG knew that if Plaintiff were to bring an action of infringement against government, all that was needed at the time (2007), was for Apple and its co-conspirators Qualcomm, Samsung, & LG to make at least one part of the inventive process abroad, and the government cannot be held liable for infringement (*Zoltek III*). This provision was not overturned until *Zoltek V* (2012).

48.     Upon information and belief, it has always been Apple and Qualcomm's goal to monopolized the smartphone industry. According to Mr. Hoffman, "[e]nrolling members of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: 'Let's take advantage of the 300 million cell phones that are out there today. They're always with us'" (Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28 <http://cellall.webcaston.tv/ home/homepage.php> (accessed 17.09.12)).

49.     Apple's collusion, and conspiracy to hinder trade, has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CMDC devices. While performing work for the government, Apple has engaged in assembling Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device [new and improved cell phone], and has managed to avoid prosecution by shielding itself under the protection of the Government.

50.     The acts charged in this complaint were done by Apple and its co-conspirators, or were authorized, ordered or done by their respective officers, employees, representatives, or agents while actively engaged in management of Apple and its co-conspirators business or

affairs. Each of the co-conspirators named herein acted as the agent or representative of, or for Apple with respect to the acts, violations and common course of conduct alleged herein.

51.    Upon information and belief, Apple colluded and conspired under the protection of a Government contract to develop Plaintiff's "new and improved cell phone" (i.e., smartphone) that is designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across multiple industries, agencies, groups, and demographics to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

52.    It is the belief of the Plaintiff, that throughout the relevant period, Apple and its co-conspirators Qualcomm, Samsung, & LG, unlawful activities as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

53.    It is the belief of the Plaintiff, that Apple and its co-conspirators Qualcomm, Samsung, & LG, are in violation of Section 1 of the Sherman Act, which prohibits every contract, combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices.

54.    In a related COFC case no 13-307C, *Larry Golden v. The United States*, Qualcomm [2019], and Apple, Samsung, & LG [2021 respectfully], were all summoned to appear to protect any interested they may have had in the case. They all fail to appear.

55.    Apple and its co-conspirators Qualcomm, Samsung, & LG, made the decisions not to appear. **Exhibit B**. By default, Apple is barred from entering a defense in this Court for non-infringement or that any of the following patent claims are invalided: Claim 1 of the '497

patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439

patent; and, claims 4-6 of the '287 patent.

56.     After a 15 year "teaming arrangement" to commercialize Plaintiff's new and

improved cell phones assembled under the *Cell-All* initiative, Verto Analytics looked at the

numbers. "Apple, Samsung, and LG (CMDC devices) smartphones owned by U.S. consumers, is

equivalent to 88% market share. January 2018, Apple led the pack, with 45% market share

(representing nearly 84 million smartphones), while Samsung claims 33% of the market (61.5

million smartphones). These two manufacturers dominate the U.S. smartphone market; LG, the

third-place contender, had 10% market share, while all other brands combined account for 12%

of the devices on the U.S. smartphone market."

57.     Below is a claim chart outline of various governmental projects that include the

integration of at least an Apple iPad tablet; an Apple laptop; or, an Apple smartphone. The

government initiatives were submitted in the related case, *Larry Golden vs. The United States*;

Case number: 13-307C) as allegedly infringing Plaintiff's patents [Ind. claims 13, 16, 17, 19, &

20 of Plaintiff's '439 patent; and Ind. claim 44 of Plaintiff's '891 patent].

58.     When the United States served a summon on Apple Inc. to appear in the above

referenced related case *Golden v. US*, Apple fail to appear to protect any interest Apple may have

in the case. Therefore, Apple waived its right to defend against allegations that Apple and its co-

conspirators [Qualcomm, Samsung, & LG] entered into an agreement to develop products and

devices under the protection of government contracts, that Plaintiff allege infringes his patents.

59.     Below are twenty-nine (29) government initiatives that Apple clearly has an

interest in. In Plaintiff's "ATPG" Stimulus Package, the strategy was for Government to create a

World demand for the technology covered in Plaintiff's stimulus packages and patents.

### Patent #: 9,589,439; Independent Claim 13

| | |
|---|---|
| Boeing MH-6 Little Bird Helicopter Apple iPad Tablet | Patent #: 9,589,439; Independent Claim 13 |
| Navy Marine Corps Intranet (NMCI) Network – Apple iPad | Patent #: 9,589,439; Independent Claim 13 |
| Variable's "NODE+Oxa" for the Apple (iPhone) Smartphone | Patent #: 9,589,439; Independent Claim 13 |

### Patent #: 9,589,439; Independent Claim 16

| | |
|---|---|
| iPhone "Biodetector" Smartphone | Patent #: 9,589,439; Independent Claim 16 |

### Patent #: 9,589,439; Independent Claim 17

| | |
|---|---|
| "VOCket System" / "Nett Warrior" Smartphone System | Patent #: 9,589,439; Independent Claim 17 |
| "Biotouch System" / "Nett Warrior" Smartphone System | Patent #: 9,589,439; Independent Claim 17 |

### Patent #: 9,589,439; Independent Claim 19

| | |
|---|---|
| EAGER: Mobile-Phone Based Single Molecule Imaging for DNA | Patent #: 9,589,439; Independent Claim 19 |
| INSPIRE Track 2: Public Health Nanotechnology and Mobility (PHeNoM) | Patent #: 9,589,439; Independent Claim 19 |
| PFI:BIC Human-Centered Smart-Integration of Mobile Imaging and Sensing | Patent #: 9,589,439; Independent Claim 19 |
| EFRI-BioFlex: Cellphone-Based Digital Immunoassay Platform | Patent #: 9,589,439; Independent Claim 19 |
| "Multimode Smartphone Biosensor" | Patent #: 9,589,439; Independent Claim 19 |

COMPLAINT

| | |
|---|---|
| EAGER: Lab-in-a-Smartphone | Patent #: 9,589,439; Independent Claim 19 |
| PFI-BIC "Pathtracker: Smartphone-based for Mobile Infectious Disease Detection" | Patent #: 9,589,439; Independent Claim 19 |
| I-Corps: Ultra-Sensitive Lateral Flow Reporters / Lab-on-Phone Platform | Patent #: 9,589,439; Independent Claim 19 |
| Smartphone (iPhone) Microscope | Patent #: 9,589,439; Independent Claim 19 |
| Smartphone (iPhone) Biosensor "Cradle" | Patent #: 9,589,439; Independent Claim 19 |
| AOptix Stratus MX Peripheral for the Apple (iPhone) Smartphone | Patent #: 9,589,439; Independent Claim 19 |
| PositiveID - Boeing / M-Band Apple (iPhone) Smartphone | Patent #: 9,589,439; Independent Claim 19 |

**Patent #: 9,589,439; Independent Claim 20**

| | |
|---|---|
| "Cell-All": Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
| "Kromek D3S-NET": Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
| Biomeme "two3" Mobile Thermocycler: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
| Smartphone-operated "LAMP box": Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
| Alluviam LLC HazMasterG3: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
| FePhone Point-of-Care: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |

| NutriPhone Lab-on-a-Chip: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
|---|---|

| FeverPhone: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
|---|---|

| Solar Thermal PCR Test: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
|---|---|

| Lab-on-a-Drone: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
|---|---|

**Patent #: RE 43,891; Independent Claim 44**

| Dream Hammer's "Ballista" Software for Computer, Tablet or Smartphone | Patent #: RE 43,891; Independent Claim 44 |
|---|---|

60.    Apple, and its co-conspirators waived their rights for later argument on patent invalidity and noninfringement for not participating in the § 1498 litigation, "[w]hile a contractor need not participate in the § 1498 litigation, contractors should be aware that failure to appear in response to a notice under Rule 14(b) acts as a waiver of any later argument that the contractor should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed." As the USCFC held in *Bowser, Inc. v. United States*:

"We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him." 420 F.2d 1057, 1060 (Ct. Cl. 1970).

61.    Section 2 of the Sherman Antitrust Act not only prohibits the abuse of monopoly power but also any "attempt to monopolize ... any part of the trade or commerce among the

several States." 15 U.S.C. § 2. Plaintiff believes he has prevailed on his attempted

monopolization claim, because Plaintiff has shown: "(1) that Apple has engaged in predatory or

anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability

of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113

S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993).

62.     Plaintiff's antitrust injury is the type the antitrust laws were intended to prevent.

Apple and its co-conspirators' anticompetitive conduct to produce and commercialize a new and

improved cell phone/smartphone under the protection of the government to avoid any

infringement liability, was clearly competition-reducing. Apple's secret conspiracy excluded and

foreclosed the market for mobile phone manufacturers such as HTC, T-Mobile, Palm,

BlackBerry, AT&T, Qwest, T-Mobile, Nokia, Panasonic, and Motorola.

63.     Apple's antitrust violations proximately caused the Plaintiff's injury. This is basic

causation. Plaintiff believes Apple's secret conspiracy reduced competition by excluding and

foreclosing the mobile phone market for OEMs such as HTC, T-Mobile, Palm, BlackBerry,

AT&T, Qwest, T-Mobile, Nokia, Panasonic, and Motorola. Plaintiff's antitrust injury resulted

from Plaintiff's inability to 1) enter into a licensing agreement with Apple and its co-conspirators

(Qualcomm, Samsung, & LG), 2) enter into a licensing agreement with the OEMs (HTC, T-

Mobile, Palm, BlackBerry, AT&T, Qwest, T-Mobile, Nokia, Panasonic, and Motorola) because

of Apple and its co-conspirators' anticompetitive conduct, and 3) bring an action of direct

infringement (before 2012) against Apple and its co-conspirators for patent infringement.


## APPLE'S KNOWLEDGE OF PLAINTIFF'S
## CMDC DEVICES & APPLE'S "UNJUST ENRICHMENT"


COMPLAINT

64.    Plaintiff believes Apple has unjustly enriched itself [*the doctrine of unjust enrichment allows a plaintiff to recover from a defendant, without the benefit of an enforceable contractual obligation, where the defendant has unfairly benefited from the plaintiff's efforts without compensation*] by using Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices (i.e., a communication device of at least one of a cell phone, a smart phone, a laptop, a tablet or smartwatch), and Plaintiff's central processing units (CPUs), i.e., the "brains" of the CMDC devices. No CMDC device— cell phone, a smart phone, a laptop, a tablet or smartwatch—can function without at least one central processing unit (CPU).

65.    Plaintiff's claim for unjust enrichment requires the Plaintiff to show that: (1) Plaintiff conferred a benefit onto Apple; (2) Apple had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for Apple to retain the benefit without payment of its value.", *Platz Associates v. Finley*, 973 A.2d 743, 750 (2009). The unjust enrichment occurred when Party A (Plaintiff) conferred a benefit upon Party B (Apple) without Party A (Plaintiff) receiving the proper restitution required by law.

66.    On 11/19/2010: Plaintiff's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Tim Cook, Chief Operating Officer (COO) of Apple, and Mr. Bruce Sewell, SVP & General Counsel; to 1 Infinite Loop, Cupertino, CA 95014. Apple received and signed for the letters 11/16/2010. Tracking Nos: 7009 2250 0001 0170 9861 and 7009 2250 0001 0170 9854. **(Exhibit C)**

67.    In Plaintiff's notice letters; Plaintiff is quoted as saying "[m]y technology covers electronic devices, mobile devices, authentication (biometrics) technology; mobile devices lock and unlock features, RFID reader technology for mobile devices, embedded sensors in electronic

devices, embedded sensors in mobile and portable devices, mobile phones as readers, embedded sensors in cell phone cases; mobile, electronic and portable devices used as monitoring equipment for locating, tracking, navigating and status of sensors."

68.     On 07/01/2019, Plaintiff responded back to Apple's Krista Grewal, Counsel IP Transactions, on Plaintiff's "Cease and Desist" request. **(Exhibit D)** Plaintiff is quoted as saying:

69.     Certain Apple Inc.'s smartphones, laptops, tablets, and smartwatches are infringing at least one patent claim of PO's following patents: [7,385,497]; [7,636,033]; [8,106,752]; [8,334,761]; [8,531,280]; [RE43,891]; [RE43,990]; [9,096,189]; [9,589,439]; and, [10,163,287].

70.     Certainly, I appreciate the comment you made in defense of Apple's infringing activities in your last correspondence via email dated June 27, 2019: "As an example, no Apple product includes detectors or indicator lights for detecting "at least one of chemical, biological, radiological, or explosive" agents and compounds as required by the asserted patents."

71.     To address your comments above. Apple's smartphones; Apple's smartwatches; or Apple's smartphones interconnected to Apple's smartwatches; all, infringes at least one patent claim for a CMDC device(s) of the PO's patents listed above for chemical, biological, radiological, or explosive" agents and compounds. (Exhibit 1 for Chart Outline of Patent Claims)

72.     Apple has applied for patents for its smartphones and smartwatches that covers chemical and biological detection; biometric fingerprint and signature; motion sensors; and, the detection of humans. I expect Apple to submit to the USPTO an IDS to disclose my patents as prior art references for continued prosecution. If you fail to do so, I will seek to have the issued patents invalidated.

73.     Because Apple's smartphones; Apple's smartwatches; or Apple's smartphones interconnected to Apple's smartwatches infringes my CMDC device(s), I am demanding Apple "cease and desist" the manufacture, offer for sell, the sell, and the inducement of others to infringe my patented invention(s) (i.e. the government, the automobile industry, the medical industry, the home security industry, etc.)

74.     On 03/31/2021; in the related case, COFC 13-307C, *Golden v. US*, Apple was issued a "NOTICE" by the Court to appear to defend its interest in the case. **(Exhibit E)**

75.     Plaintiff, in the related case, COFC 13-307C, *Golden v. US*, identified ten alleged infringing products that Plaintiff believes infringes at least 25 independent claims of Plaintiff's patents asserted in the case [claim 1 of the '497 patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439 patent; and, claims 4-6 of the '287 patent]. An example of Apple's alleged infringement of at least 25 independent claims of Plaintiff's patents is attached. **Exhibits F**

76.     When the United States served a summon on Apple Inc. to appear in the above referenced related case *Golden v. US*, Apple fail to appear to protect any interest Apple may have in the case.

77.     Apple, and its co-conspirators waived their rights for later argument on patent invalidity and noninfringement for not participating in the § 1498 litigation, "[w]hile a contractor need not participate in the § 1498 litigation, contractors should be aware that failure to appear in response to a notice under Rule 14(b) acts as a waiver of any later argument that the contractor should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed." As the USCFC held in *Bowser, Inc. v. United States*:

> "We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him." 420 F.2d 1057, 1060 (Ct. Cl. 1970)

78.     The US District for the Eastern Court of Texas in *Motiva Patents, LLC v. HTC Corporation,* E.D. Texas, 9:18-cv-00179 (Oct. 2019), ruled that having a policy of ignoring others' patents is sufficient grounds to support claims of willful patent infringement.

79.     The Eastern District Court found HTC's policy of ignoring others' patents opened the door for support of Motiva's assertions that HTC willfully infringed upon Motiva's patents. The court stated that intentionally being blind to the facts was essentially the same as knowing about a competitor's patent and infringing on it anyway.

80.     The basic principle of "ignorance of the law is no excuse" applies to patent infringement—as the defendant in a Texas patent case discovered.

## THE SCOPE OF PLAINTIFF'S CMDC DEVICES

81.     The scope of Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices was challenged in an *Inter Partes Review* (IPR) and was found to be acceptable because "[t]he specific devices [a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products for communication therebetween], such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."

> *UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner.* IPR Case IPR2014-00714 Patent RE43,990 E Before LORA M. GREEN, JON B. TORNQUIST, and KEVIN W. CHERRY, Administrative Patent Judges. CHERRY, Administrative Patent Judge. FINAL WRITTEN DECISION 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 "Beginning with the claim preamble amendment, the

preamble of claim 11 originally read: "A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal *at a monitoring site for monitoring products for communication therebetween,* comprising…." In claim 154, the language in italics has been eliminated and replaced with "the products grouped together by common features in the product groupings category of design similarity (e.g., computer terminal, personal computer (PC)) …." Patent Owner contends that this new language is consistent with words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further contends that this new language is broad enough to include the removed items, such as cell phones and smart phones, because those items are "species terms" that are "included in the genus 'monitoring equipment' and 'communication device' when the clause 'products grouped together by common features in the product groupings category of design similarity' is included." Id. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." *Id*

82.   Plaintiff believes the new and improved cell phones, smartphones, laptops, tablets, and smartwatches Apple has "used without authorization"; and, the central processing units (CPUs) Apple has made for the new and improved cell phones, smartphones, laptops, tablets, and smartwatches; offered for sale, and sold since receiving knowledge of Plaintiff's intellectual property and patents (2010); Apple has generated hundreds of billions in revenue.

83.   Plaintiff believes Apple mass produced and rushed to market Plaintiff's patented inventions of new and improved cell phones, smartphones, laptops, tablets, and smartwatches; and; new and improved CPUs made for Plaintiff's CMDC devices, to prevent Plaintiff's market entry, and restrained competition.

COMPLAINT

84.     Plaintiff believes Apple is in violation of Section 2 of the Sherman Act, because Apple maintained a specific intent to monopolize both current and future generations of cell phones, smartphones, smartwatches, laptops, tablets, and CPUs. Apple, a monopolist, has excluded Plaintiff and its competitors, and has established market dominance for Plaintiff's patented inventions through its anticompetitive practices.

## WILLFUL PATENT INFRINGEMENT

85.     Apple, Samsung, LG, and Qualcomm assembled the CMDC device while under Government contract. Plaintiff believes Apple, Samsung, LG, and Qualcomm was guided by Plaintiff's "product grouping" strategies. Plaintiff's CMDC [smartphone] device is Plaintiff's invention, of inventions. See below: **Exhibits G-M; '497, '752, '189, '439, '287, '619, '891 patents**

I. Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent

II. Central Processing Units for CMDC Device – Claim 5 of the '287 Patent

III. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent

IV. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent

V. Embedded CBRN Sensors for CMDC Device – Claim 16 of the '439 Patent

VI. Interchangeable Sensors for CMDC Device – Claim 20 of the '439 Patent

VII. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent

VIII. Remote/Electrical Lock for CMDC Device – Claim 125 of the '990 Patent

IX. Pre-Programmed Lock for CMDC Device – Claim 1 of the '287 Patent

X. Fingerprint / Face Recognition for CMDC Device – Claim 1 of the '619 Patent

XI. Stall, Stop, Slowdown for CMDC Device – Claim 11 of the '891 Patent

XII. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent

XIII. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent

XIV. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent

## I. Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent



**Claim 14 of the '439 Patent** "Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween …

**Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone)**

**Claim 23 of the '439 Patent**: "A cell phone comprising: a central processing unit (CPU) for executing and carrying out the instructions; … whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems … multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

"In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals

Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, …, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, … handhelds;

## II. Central Processing Units (CPUs) for CMDC Device – Claim 5 of the '287 Patent



Example: Apple's A13 Bionic Chip contains 8.5 billion transistors and six CPU cores. "For instance, the CPU team will study how applications are being used on iOS and then use the data to optimize future CPU designs." https://www.wired.com/story/apple-a13-bionic-chip-iphone/

**Central Processing Units (CPUs) for Smartphone**

**Claim 5 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to control components of a vehicle, … or send signals to detect … chemical, biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. **[See also claims 4 & 6 of the '287 patent; and, claims 1 & 11 of the '619 patent]**.

The "smartphone processor (CPU), also known as chipset, is a component that controls everything going on in your smart-phone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors. html. "[T]oday's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).

## III. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent







### Camera CBR Sensor(s) for Smartphone

Camera Sensor for Radiological Detection: How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app … works well enough to alert users to dangerous levels of radiation.

Camera Sensor for Biological Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera." (Image: Science at Cal).

Camera Sensor for Chemical Detection: The sensor **Rhevision** and UC San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can detect them; the phone's camera watches the chip for color changes.

**Claim 4 of the '189 Patent**: A built-in, embedded multi sensor detection system … sensor array or fixed detection device into the product that detects agents …

## IV. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent



Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/

### Smartwatch CBR Detector for Smartphone

**Claim 19 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: a plurality of sensors … capable of being disposed within, on, upon or adjacent a multi-sensor detection device.

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

COMPLAINT

## V. Embedded CBRN Nanosensors for CMDC Device – Claim 16 of the '439 Patent



**Embedded CBRN Sensors for Smartphone (NASA)**

**Claim 16 of the '439 Patent**: A built-in, embedded multi sensor detection system ... a cell phone, a smart phone

A silicon-based sensing chip, which consists of 64 nanosensors can turn a cell phone into a *portable poison detector*. (NASA). "can turn your cellphone into a *portable "silent killer" detector* https://www. foxnews.com/tech/smartphones-take-on-silent-killers-as-portable-danger-detectors & Nuclear Radiation Nanosensors and Nanosensory Systems https://link.springer. com/book/10.1007/978-94-017-7468-0

## VI. Interchangeable Sensor Device for CMDC Device – Claim 20 of the '439 Patent



**Plurality of Interchangeable Sensor Device for Smartphone: (NASA & Subtractor George Yu)**

**Claim 20 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents...

The system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform. A cylinder that transmits data from sensors to smart-phone. The NODE+ is compatible with Android and Apple smart devices.

## VII. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent



MIT-- wirelessly detect hazardous gases by using a simple sensor made from near-field communication (NFC) tags that can be read by a smartphone... detect gaseous ammonia, hydrogen peroxide, and cyclohexanone, and other gases... Sensors. Retrieved from: https://phys.org/news/ 2014-12-cheap-sensor-transmit-hazardous-chemicals.html

**Near-Field Communication (NFC) CBR Tag for Smartphone (Safer than RFID tag)**

**Claim 21 of the '439 Patent**: A multi-sensor detection system ... at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication

In November 2007, two Defense Department contractors, and a U.S. city's bomb squad demonstrated how an RFID tag could send a signal to ... detonated a small amount of explosives in a container a simple emission of a radio signal traveling on the approved RFID 433 MHz frequency. Officials from the Defense Department and DHS observed the demonstration. https://www.nationaldefense-magazine.org/articles/2011 /2/1/2011february-military-supply-chain-tracking-system-both-inefficient-and-dangerous

COMPLAINT

## VIII. Remote/Electrical Lock Disabler for CMDC Device – Claim 125 of the '990 Patent



**Remote/Electrical Lock Disabler for Smartphone (Gov. Contractor iControl's MATTs & mLOCK)**

**Claim 125 of the '990 Patent**: A multi-sensor detection system … whereupon detection causes a signal to be sent to the at least one communication device followed by communicating with the internal or external remote/electrical lock disabler.

Marine Asset Tag Tracking System (MATTS) is a DHS initiative for "Smart Container". MATTS "gateway": a wireless electronic device that communicates with a sensor array; the communication device; and locking mechanism for locking status and GPS location. Internal /external sensors are intercomnected to operate with the MATTS device and can detect gas concentrations, radiation, humidity and moisture, atmospheric pressure, etc. The mLOCK communicates bi-directionally using encrypted messages between the lock and the MATTs readers or mobile devices (i.e., smartphone)

## IX. Pre-Programmed Lock Disabler for CMDC Device – Claim 1 of the '287 Patent





"Monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock…"

**Pre-Programmed Lock Disabler for Smartphone**

Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android or iOS device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Account Login. On an Android or Apple Phone, multiple attempts (usually five attempts or more) with an unknown or a wrong pin will go either into a delay before further attempts are allowed …

FBI Failed Attempts to Unlock Phone: The FBI recovered an Apple iPhone 5C—owned by the San Bernardino County, California government—that had been issued to its employee Syed Rizwan Farook, one of the shooters involved in the December 2015 San Bernardino attack. The attack killed 14 people and seriously injured 22. The two attackers died four hours after the attack in a shootout with police ... Authorities were able to recover Farook's work phone, but could not unlock its four-digit passcode, and the phone was programmed to automatically delete all its data after ten failed password attempts (an anti-theft measure on smartphones).

**Claim 1 of the '287 Patent**: Monitoring equipment that is at least one … a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

## X. Fingerprint and Face Recognition for CMDC Device – Claim 1 of the '619 Patent



**Fingerprint and Face Recognition for Smartphone**

**Claim 1 of the '619 Patent**: A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition

## XI. Stall, Stop, or Vehicle Slowdown for CMDC Device – Claim 11 of the '891 Patent



Driverless car smartphones, authorizes the phone to control functions. Smartphones and driverless technology: instant braking for autonomous cars; sensors detect interference, obstacles and oncoming cars; instant breaks to avoid collisions.

**Stall, Stop, or Vehicle Slowdown for Smartphone**

**Claim 11 of the '891 Patent**: A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising: at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

Remote Vehicle Shutdown is a system of remotely shutting down the connected vehicle, using radio pulses; intended for police, military and security use. Remotely find and disable stolen vehicles; ability to prevent engine start; prevent movement of a vehicle; stop or slow an operating vehicle; gradually decelerate a vehicle by downshifting, limiting the throttle capability; and, improve security of carriers of high-risk cargo, like hazardous materials. Security features that Remote Vehicle Shutdown provides. https://www.globenewswire.com/en/news-release/2019/12/17/1961557/0/en/Remote-Vehicle-Shutdown

## XII. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent



**Autonomous and Driverless Vehicle Monitoring with Smartphone**

**Claim 44 of the '891 Patent**: A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means ... (Dep. 55) ... 44, further can be adapted, modified or designed to include a vehicle designed to perform as a driverless or autonomous vehicle ... in operation with or without a user, driver or operator inside the vehicle.

## XIII. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent



**Connect Vehicle with Smartphone**

**Claim 4 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to lock or unlock doors, send signals to control components of a vehicle, … or send signals to detect … chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

CarLink™ is a Smartphone interface that allows you to start your vehicle, unlock your doors or pop the trunk from virtually any distance, or help you find your car in a large garage after a sporting event or a trip to the mall. *Compatible with iPhone, BlackBerry and Android *Remote Start Compatible *Door lock and unlock *Car find feature (horn honk and/or flashing lights) *Control trunk release or sliding door open)

## XIV. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent



The smartphone can be used as an IoT device for Personal emergency response, fitness tracking, location-based asset tracking, natural vision processing, and a Bluetooth gateway for wearable Bluetooth devices that enable many IoT monitoring apps. Also, identity verification, GPS based guidance, position/orientation awareness apps for smartphone-based implementation.

**Internet-of-Things (IoTs) with Smartphone**

**Claim 11 of the '619 Patent**: A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device

The Internet-connected smartphones, can directly capture and compile data from as many as 14 different sensors:
   Accelerometer, GPS, Gyroscope, Magnetometer, Biometrics, Camera, Barometer, Proximity Sensors, Bluetooth connectivity, Barcode readers, Touchscreen sensors, Heart rate monitor, ECG, Haptic feedback sensors

The IoTs contain computing hardware, including processors with embedded programming telling them what to do, sensors that gather various sorts of readings (such as temperature, motion, chemical levels, heart rate and body movement) and communication hardware that can send and receive signals.

# APPLE'S INVASION ON PLAINTIFF'S INTELLECTUAL PROPERTY SUBJECT MATTER IS TOO EXPANSIVE TO BE COINCIDENTAL

COMPLAINT

86.    The issue with "intent" is; "did Apple know it was doing something wrong?" Plaintiff believes the antitrust violations alleged in this case are too massive to be unintentional.

87.    The legal standards in antitrust law are generally viewed as combinations of conduct and intent standards. Apple's intent is general when Apple simply engaged in conduct that violates the law. Plaintiff alleges Apple's antitrust violations are more specific because Apple engaged in the anticompetitive conduct for particular reasons (e.g., to harm the Plaintiff, competitors, investors, consumers, the SEC, and the USPTO), or with particular knowledge.

88.    Case law suggests that Plaintiff must meet a higher burden with respect to Apple's intent under Section 2 of the Sherman Act than is typically required under Section 1. Under Section 1, Plaintiff demonstrated that Apple intended to engage in conduct that is asserted to violate the law. Under Section 2, Plaintiff produced evidence that is consistent with a specific intent to monopolize, in the sense that the overwhelming—perhaps the sole—purpose of the Apple's conduct is to reduce competition and restrict market entry.

89.    The conduct standard in antitrust law is the rule of reason test, which requires proof that the competitive harms from Apple's conduct outweigh any purported benefits to consumers from that conduct. Plaintiff believes the consumers and customers were drawn into a scheme of deceit (e.g., consumers reliance upon false information to cover inflated prices), and fraud (e.g., simply not telling the whole story to the OEMs in order to make a deal happen).

90.    The second type of legal standard, an intent standard, determines liability in part by evidence concerning Apple's state of mind. Plaintiff's claims require proof merely of Apple's intent to carry out the conduct set forth in the complaint; these claims fall under a general intent standard. These claims require only that Apple knew that it was taking a particular action, not that Apple does so with the purpose of bringing about a particular (undesirable) result.

91.     Plaintiff believes Apple's invasion on Plaintiff's intellectual property subject matter is too expansive to be coincidental. Plaintiff believes Apple produced Plaintiff's patented CPUs as prototypes for the OEMs to test with their products. Plaintiff believe Apple design Plaintiff's patented CMDC devices to function with the CPUs designed for them by Apple.

92.     Apple was able to form and maintain its monopoly status by using, making, offering for sale, and selling Plaintiff's patented inventions.

## RELIEF

A.  Temporary injunctive relief for Apple to discontinue the making, offering for sale, and selling of its central processing units (CPUs) for smartphones, tablets, and smartwatches.

B.  Temporary injunctive relief for Apple to discontinue the use Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e., new and improved cell phones, smartphones, tablets, laptops, and smartwatches) that are currently being made and sold, by Apple without authorization to generate billions in revenues.

C.  Summary judgement on the merits of the case for willful infringement; direct infringement; and, infringement under the *doctrine of equivalents*.

D.  Damages found or assessed for willful infringement; direct infringement; and, infringement under the *doctrine of equivalents*.

E.  Damages up to three times the amount found or assessed for willful infringement.

F.  Summary judgement on the merits of the case for Apple's single-firm anticompetitive conduct (under sections 1 & 2 of the Sherman Act), and unjust enrichment.

COMPLAINT

G. Damages found or assessed for Apple's single-firm anticompetitive conduct (under Section 2 of the Sherman Act), that has cause Antitrust injury to the Plaintiff, and that harms the competitive process and thereby harms consumers.

H. Trible damages for the Antitrust injury imposed by Apple for violating Federal Antitrust Laws (Section 4 of the Clayton Act, 15 U.S.C.S. § 15, which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees.

I. The Court orders Apple to establish, at minimum, a $30 billion dollar reserve with the SEC for "Probability of the Incurrence of a Loss". The reserve is returned to Apple if found not liable in this case.

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

COMPLAINT

# SERVICE OF PROCESS

Apple Inc.

One Apple Park Way,

Cupertino, CA 95014