# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# (SAN FRANCISCO)

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

FILED

SEP 08 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

---

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

APPLE INC.

Defendant.

---

CASE NO: <u>3:22-cv-04152-VC</u>

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Willful Patent Infringement).**

September 6, 2022

## <u>PLAINTIFF'S RESPONSE TO APPLE'S MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGEMENT</u>

This is a civil action brought under Antitrust Law violations commencing from competitor collaborations, conspiracy to restrain trade, and the illegal formation or maintenance of a monopoly, which likely resulted from secret conspiracies that involve exclusive agreements and the anticompetitive practices that "unjustly enriched" Apple; recognized by this Court.

## SUBJECT MATTER JURISDICTION AND STATEMENT OF A CLAIM FOR WHICH RELIEF CAN BE GRANTED

Federal district courts have exclusive jurisdiction to hear federal antitrust claims. To hear a particular case, a court must have subject-matter jurisdiction, which refers to the court's ability to hear that particular type of case. In the antitrust context, federal courts can hear cases brought under the federal antitrust laws (federal question jurisdiction) or cases involving state law claims between parties from different states or countries as long as the amount in controversy is sufficient (diversity jurisdiction). Subject-matter jurisdiction cannot be waived, so even if the parties do not litigate the issue, a court can examine the question on its own.

Private causes of actions are available for most forms of unlawful conduct and are typically grouped into three separate types of cases: cases challenging coordinated conduct in violation of section 1 of the Sherman Act; cases challenging monopolistic conduct in violation of section 2 of the Sherman Act; and Section 4 of the Clayton Act which establishes a private cause of action for plaintiffs to recover damages for any violation of federal antitrust law. Most claims brought pursuant to section 4 allege a violation of section 1 of the Sherman Act and section 2 of the Sherman Act (which prohibits monopolization and attempted monopolization).

Coordinated conduct in violation of section 1 of the Sherman Act includes conduct such as collusion among competitors, anticompetitive vertical agreements, and agreements among competitors that unreasonably restrain trade. Unilateral conduct in violation of section 2 of the Sherman Act includes conduct such as certain cases of tying or bundling products, certain exclusive dealing practices and other attempts to artificially create a monopoly.

Antitrust standing is limited to consumers and competitors in the relevant market and, as recognized by this court, those whose injuries are "inextricably intertwined" with the alleged conduct. A claimant's injury is "inextricably intertwined" with the alleged conduct if the claimant was directly targeted and its harm was "the essential component of [the defendant's] anticompetitive scheme as opposed to an ancillary byproduct of it." (*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015)).

Federal courts have exclusive jurisdiction over patent infringement actions, which can be filed in any federal district court having personal jurisdiction over the defendant.

35 U.S.C. § 271(d): "No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal

extension of the patent right by reason of his having done one or more of the following: … (3) sought to enforce his patent rights against infringement or contributory infringement;"

Under U.S. patent law, a patentee may recover damages from an infringer for indirect [contributory] infringement. Induced infringement occurs when an infringer does not itself practice each and every element of a claim but rather actively induces or contributes to the infringement of a third party, *See* 35 U.S.C. § 271(b)-(c). Contributory infringement requires: (1) knowledge of the infringed patent; (2) providing to a third party a material component of an infringing article; and (3) that the component is especially made or adapted for use in such infringing article. 35 U.S.C. § 271(c).

Hence, unlike for direct infringement, a patentee alleging [contributory] infringement must prove that the accused infringer had knowledge of the asserted patent. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2062-63, 2068-69 (2011). Similar to contributory infringement, allegations of willful infringement also require knowledge of the patent. *See* 35 U.S. Code § 284 (2011); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964 (Fed. Cir. 2021).

The Federal District Courts has jurisdiction over claims of patent infringement between private entities under 35 U.S.C. § 271. The Court of Federal Claims (COFC) have jurisdiction over claims of patent infringement against the Government under 28 U.S.C. § 1498.

In the related COFC case no. 13-307C *Golden v. USA*, **Exhibit A**, in its REPORTED OPINION granting in part and denying in part Government's Motion to Dismiss… Dkt. 130, filed 03/29/2018: [Court dismissed 61 of 72 infringement allegations referencing smartphones]

> "Patent Infringement Allegations Concerning The Government's Alleged Use Of" Smartphones And Other Consumer Devices" Must Be Dismissed Under RCFC 12(b)(I) And 12(b)(6)" … The Government also argues that the [] "allegations relating generally to smartphones [] should be dismissed" under RCFC 12(b)(1) and 12(b)(6) … In sum, [] the factual allegations [] do not support the conclusion that the Government used or authorized the use of these devices in an infringing manner. For these reasons, the court has determined that the patent infringement allegations [] failed to satisfy Plaintiff's burden to establish jurisdiction under 28 U.S.C. § 1498(a). Accordingly, these paragraphs of the [] must be dismissed under RCFC 12(b)(1) … the allegations contained therein failed to state a claim upon which relief may be granted and must be dismissed under RCFC 12(b)(6)"

Therefore, jurisdiction rest with this Northern District Court of California as a case of patent infringement between private entities under 35 U.S.C. § 271, because it has already been determined by the COFC that the COFC does not have jurisdiction to hear the case.

## CONCEPTION OF PLAINTIFF'S "CMDC" DEVICE

I can remember September 11, 2001 (9/11) is the day my life was changed forever. I was traveling through downtown Columbia, SC when I noticed the police and other authorities scrambling to protect vulnerable buildings and sites from what may be another terrorist attack.

When I return home to Mauldin, SC I watched the attacks over and over again all day long, thinking to myself, I have to do something. I can remember watching the explosions when the airplane hit the towers, thinking there must be a way to detect for CBRNE agents that's being carried on or in a moving vehicle. That's the concept behind my SafeRack & V-Tection projects.

I decided to separate the two projects for the moment to develop a strategy of using the technical rational behind the SafeRack project (detection devices for CBRNE-H detection), and the technical rational behind the V-Tection project (stall, stop, vehicle slowdown); to create economic stimulus packages for restoring our Nation's economy (new businesses and jobs).

I designed a "product grouping" strategy to outline the advantages of grouping products of common features and design similarities for mass producing to reduce cost. But first, the "demand" had to be generated. That's where the Government agencies comes in.

But, before campaigning to generate the demand for the technology, I knew, I needed a device that's capable of communicating, monitoring, detecting, and controlling (CMDC), that can be used to not only connect or integrate the technology for the SafeRack and V-Tection projects, but that can also be used by both the Government and the American consumer. I decided to call this project the Anti-Terrorism Product Grouping (ATPG) project.

For consumer use, I knew, I had to include some safety features such as using NFC instead of RFID (DHS demonstrated how RFID can be used to detonate bombs); biometric authentication (i.e., fingerprint, facial, etc.); advanced tracking and location; and, a lock disabling mechanism that locks the CMDC device after multiple failed attempts to unlock.

I began my campaign by sending the "Economic Stimulus and Terrorism Prevention Packages" to three U.S. Senators from South Carolina. They in turn sent me letters, notifying me that they had sent the packages over to the Department of Homeland Security (DHS).

Next, I sent the "Economic Stimulus and Terrorism Prevention Packages" to the President and Vice-President of the United States. Both their offices sent me a letter, notifying me that they had sent the packages over to the Department of Homeland Security (DHS). I also sent the packages to the President's Council of Economic Advisors.

When I call the President's Council of Economic Advisors, they informed me that they had the packages but could not move on them until the President say so.

I was invited to the DHS to discuss my "product grouping" strategy and the technical rational behind each of the packages, three times. On one occasion, my lead engineer traveled with me. I was asked to send a read-ahead document before the meeting that describes my work.

The first solicitation for the assembly and development of my CMDC device was issued in 2007 [DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing*]. DHS was seeking proposals for a new cell phone capable of biological and chemical sensing.

For the program's initial phase in 2007, DHS released a call for proposals inviting the **private sector** to develop a proof of concept for the "*Cell-All Ubiquitous Biological and Chemical Sensing*" project (U.S. Department of Homeland Security, 2007). Cell-All Ubiquitous Biological and Chemical Sensing. <https://http://www.fbo.gov/index?s=opportunity&mode= form&id =f292c1fdbd46777a3ff8ca64ef96658f&tab=core&_cview=1> (accessed 17.09.12).

DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010, *Cell-All: Super Smartphones Sniff Out Suspicious Substances* <http://www.dhs.gov/cell-all-super-smartphones-sniff-out-suspicious-substances>).

Under the DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, the third-party contractors were given "consent and authorization" to private parties' infringement, *Sheridan v. United States*, 120 Fed. CL at 131, to develop and assemble under the *Cell-All* initiative, my patented communication, monitoring, detecting, and controlling (CMDC) device (i.e., new and improved cell phone), according to the following:

- ❖ My patented chemical, biological, explosive, or radiological sensors and detectors [contractors: Qualcomm; Rhevision; Seacoast Science; NASA—Genel; Synkera]
- ❖ My patented new and improved cell phones [contractors: Apple; Samsung; LG]
- ❖ My patented central processing units (CPUs) [contractor: Qualcomm]
- ❖ Qualcomm's patented wireless cellular modems [contractor: Qualcomm]; and,
- ❖ My patented safety features designed for my CMDC devices that include: biometric authentication, disabling lock after multiple fail attempts to unlock, radio-frequency near-field communication, and location tracking [contractors: Apple; Samsung; LG]

After years (2002-2008) of educating the Government on how to stimulate the economy with my new and innovative technology, the DHS gave it all away to Qualcomm, Apple, Samsung, and LG.

I believe the reason why Qualcomm, Apple, Samsung, and LG fail to appear in the COFC case, after receiving Government notices is because they would have to give testimony under oath to the legitimacy of the above facts:

> The Fifth Amendment says to the federal government that no one shall be "deprived of life, liberty or property without due process of law." The Fourteenth Amendment, ratified in 1868, uses the same eleven words, called the Due Process Clause, to describe a legal obligation of all states. The Fourteenth Amendment guarantees that "[n]o State shall … deprive any person" of "property, without due process of law."

I satisfied the requirement of proving direct infringement under 28 U.S.C. § 1498(a) where the technology of the other third-party contractors—Rhevision, Seacoast Science, NASA, Synkera, and Qualcomm—was included. The problem is the Government and the Trial Court refused to accept the technology of the other third-party contractors—Rhevision, Seacoast Science, NASA, Synkera, and Qualcomm; and, enter the work they performed in the project. Without their inclusion, the case turns into a case of private parties: Golden v. Apple, Samsung, and LG, which is outside the COFC (Trial Court) jurisdiction.

The Trial Court never mention the CPUs of Qualcomm; the CBR sensors (camera sensors) of Rhevision; and, NASA subcontractor's detectors for CBRNE that's integrated with the CMDC device, but is remote from the device. The CPU, which has been a part of this case since 2013, and the internal and external sensors/detectors was incorrectly cited as enlarging.

I also satisfied the requirement of direct infringement under 35 U.S.C. § 271(a): "as a necessary predicate for proving direct infringement and government liability under section 1498" *Zoltek* III that include ***only*** the private companies of Apple, Samsung, and LG.

The United States Court of Federal Claims does not have jurisdiction to adjudicate conflicts between private parties:

> Under 28 U.S.C. § 1498, a patent owner's remedy when the United States infringes a patent is a suit against the government in the COFC. Section 1498(a) also grants authorization and consent to government contractors, in performance of their contracts, to use or manufacture any patented invention such that only the United States may be liable for infringement stemming from contract performance. The purpose of Section 1498 is to protect government contractors from private infringement actions and to limit the available remedy to suits against the United States in the COFC.

## APPLE'S MOTIVE TO FORM A CONSPIRACY, AND APPLE'S CONSPIRACY IN RESTRAINT OF TRADE

Apple's motive to conspire means that the relevant market was conducive to "collusion" due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are, by nature, more conducive to collusion.

Upon information and belief, Apple has conspired with Qualcomm, Samsung, & LG; who participated as co-conspirators with Apple in violating certain antitrust laws, and laws governing the unauthorized use of Plaintiff's patented inventions.

In 2007, Apple and the Plaintiff was competing for the same government contract. The Department of Homeland Security (DHS) issued a 'request for proposal' [DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing*]. DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the "commercialization of technology developed for government purposes"

Plaintiff believes there were three motives for Apple and its co-conspirators Qualcomm, Samsung, & LG to conspire to keep Plaintiff's entrance into the market restrained.

First, Apple and its co-conspirators knew the Department of Homeland Security had issued a solicitation for a new, useful, and improved upon cell phone. According to the USPTO, a new, useful, and improved upon product (i.e., cell phone) is patentable. Neither Apple or any of its co-conspirators held the patent for a new and improved cell phone. Plaintiff believes Apple and its co-conspirators Qualcomm, Samsung, & LG agreed to develop the new, useful, and improved upon cell phone, under the premise that none of the conspirators would ever file for a patent for the new and improved cell phone; none would market themselves as the inventor of the new and improved cell phone; none would sue the other for infringement of the new and improved cell phone; and, none would accept a license from the Plaintiff for the new and improved cell phone.

> The FTC generally pursues anticompetitive conduct as violations of Section 5 of the Federal Trade Commission Act, which bans "unfair methods of competition" and "unfair or deceptive acts or practices." *Horizontal Conduct*: "It is illegal for businesses to act together in ways that can limit competition, lead to higher prices, or hinder other businesses from entering the market. The FTC challenges unreasonable horizontal restraints of trade. Such agreements may be considered unreasonable when competitors interact to such a degree that they are no longer acting independently, or when

collaborating gives competitors, the ability to wield market power together. Certain acts are considered so harmful to competition that they are almost always illegal."

Section 2 of the Sherman Act regulates monopolies or conspiracies or attempts to monopolize any part of interstate or foreign commerce. Apple and its co-conspirators "conspiracy to monopolize" only requires that the agreement between Apple and its co-conspirators was entered into with the specific intent of acquiring monopoly power. Following the agreement, it requires at least one overt act [to use without authorization, a patent, or a license Plaintiff's patented products to achieve the specific intent]; to accomplish the objectives. Unlike a cause of action for "attempt to monopolize", an actual ability to achieve a monopoly or a show of power is not required. After a 15 year "teaming arrangement" to commercialize Plaintiff's patented new and improved cell phones assembled under the *Cell-All* initiative, Verto Analytics looked at the numbers:

> "Apple, Samsung, and LG smartphones owned by U.S. consumers, is equivalent to 88% market share. January 2018, Apple led the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender, had 10% market share, while all other brands combined account for 12% of the devices on the U.S. smartphone market."

Second motive to conspire: Apple and its co-conspirators Qualcomm, Samsung, & LG knew they were free from liability of infringement if they performed the work under a government contract. Plaintiff believe Apple and its co-conspirators Qualcomm, Samsung, & LG knew that with "authorization and consent" from the government, they were immune from the liability of infringing Plaintiff's inventions. They also knew that if Plaintiff decides to bring an action, it must be brought against the government in the Court of Federal Claims.

Third motive to conspire: Apple and its co-conspirators Qualcomm, Samsung, & LG knew that if Plaintiff were to bring an action of infringement against government, all that was needed at the time (2007), was for Apple and its co-conspirators Qualcomm, Samsung, & LG to make at least one part of the inventive process abroad, and the government cannot be held liable for infringement (*Zoltek III*). This provision was not overturned until *Zoltek V* (2012).

Upon information and belief, it has always been Apple and Qualcomm's goal to monopolized the smartphone industry. According to Mr. Hoffman, "[e]nrolling members of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public

resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: Let's take advantage of the 300 million cell phones that are out there today. They're always with us'" (Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28 <http://cellall.webcaston.tv/ home/homepage.php> (accessed 17.09.12)).

This injury is of the type the antitrust laws were intended to prevent; which makes the defendant's conduct unlawful. The Antitrust injury imposed by Apple for violating Federal Antitrust Laws: Section 1 of the Sherman Act, "conspiracies in restraint of trade"; means any activity which tends to limit trade, sales and transportation in interstate commerce or has a substantial impact on interstate commerce.

**Antitrust Injury**

Apple's collusion, and conspiracy to hinder trade, has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CMDC devices. While performing work for the government, Apple has engaged in assembling Plaintiff's CMDC device, and has avoided prosecution by shielding itself under the protection of the Government.

The acts charged in this complaint were done by Apple and its co-conspirators, or were authorized, ordered or done by their respective officers, employees, representatives, or agents while actively engaged in management of Apple and its co-conspirators business or affairs. Each of the co-conspirators named herein acted as the agent or representative of, or for Apple with respect to the acts, violations and common course of conduct alleged herein.

Upon information and belief, Apple colluded and conspired under the protection of a Government contract to develop Plaintiff's "new and improved cell phone" (i.e., smartphone) that is designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across multiple industries, agencies, groups, and demographics to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

It is the belief of the Plaintiff, that throughout the relevant period, Apple and its co-conspirators Qualcomm, Samsung, & LG, unlawful activities as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

It is the belief of the Plaintiff, that Apple and its co-conspirators Qualcomm, Samsung, & LG, are in violation of Section 1 of the Sherman Act, which prohibits every contract,

combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices.

**Pursuant to FRCP Rule 56**:

Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to challenge Plaintiff's "conspiracy in restraint of trade" claim, and the resulting "antitrust injury; no genuine dispute on how Apple obtain and is maintaining its monopoly; no defensive agreement that justifies why Apple is unjustly enriching itself with use of Plaintiff's patented inventions; and, therefore, no reason to prolong summary judgement in this case. Plaintiff is entitled to judgment as a matter of law.

## PLAINTIFF'S "CMDC" DEVICE IS UNIQUELY DESIGNED TO COMMUNICATE, MONITOR; DETECT, & CONTROLL

| Claim 23 of Plaintiff's '439 Patent | |
|---|---|
| **PREAMBLE** | *A cell phone comprising*: <br> a central processing unit (CPU) for executing and carrying out the instructions of a computer program; |
| **COMMUNICATING** | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range … (RF) connection, short … frequency (RF) connection, or GPS connection; |
| **MONITORING** | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked … biometric lock disabler to prevent unauthorized use; |
| **DETECTING** | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; |
| **CONTROLLING** | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone … device; |

| Claim 4 of Plaintiff's '287 Patent | |
|---|---|
| **PREAMBLE** | ***A communication device comprising***:<br><br>At least one central processing unit (CPU); |
| **COMMUNICATING** | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU |
| **MONITORING** | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device |
| **DETECTING** | at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; |
| **CONTROLLING** | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent … |
| **C M D C** | … such that the communication device is capable of ***communicating, monitoring, detecting, and controlling*** |

| Claim 2 of Plaintiff's '189 Patent | |
|---|---|
| **PREAMBLE**<br>*(Product Grouping)* | ***Monitoring equipment*** of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising: |
| **COMMUNICATING**<br>*(Product Grouping)* | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection |
| **MONITORING**<br>*(Product Grouping)* | a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user |
| **DETECTING**<br>*(Product Grouping)* | a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device |

| | |
|---|---|
| **CONTROLLING** *(Product Grouping)* | whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage and disengage or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| **PRODUCT GROUPING** | wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity |

House Minority Leader Nancy Pelosi said that federally-funded research, not Apple and late CEO Steve Jobs, invented the iPhone: "Anybody here have a smartphone? In this smartphone, almost everything came from federal investments in research, GPS created by the military, flat screens, LLD [sic], digital camera, wireless data compression, research into metal alloys for strength and lightweight, voice recognition. The list goes on and on." "They say Steve Jobs did a good idea designing it and putting it together. Federal research invented it," Pelosi said. https://www.cbsnews.com/sanfrancisco/news/nancy-pelosi-apple-iphone-steve-jobs-federal-research/

Steve Jobs made some controversial comments about innovation during his career. He expressed strong agreement with the following aphorism which he ascribed to the famous painter Pablo Picasso: "*Good artists copy; great artists steal.*" https://quoteinvestigator.com/2013/03/06/artists-steal/

When Steve Jobs stole Xerox's inventions, he didn't just transplant ideas. He took the time to carefully recreate the entire development process. Rather than mimicking what he saw, Jobs studied the technology until his understanding had even surpassed the engineers who invented it. https://writingcooperative.com/steve-jobs-good-artists-copy-great-artists-steal-4fc6593ac09

I should not have to beg the Government and the Courts to be fair with me when all I have tried to do is save lives and build our Nation's economy. Doing what's right isn't always easy, and I do understand why the Government and the Courts are doing all that is within their power to conceal how, and who [an African-American], is responsible for the invention of the CMDC (smartphone) device.

The Government and the Courts are stuck on viewing my inventions and my work as "frivolous" because they believe it to be "*to fantastical*" and "*to unbelievable*". The Government

and the Courts in this case has made it very clear: that a Black man, who was once enslaved; once considered only three-fifth human; once denied citizenship; and, once could not own property (a patent) because was once considered property, does not have the "brains" to invent.

> In 1857, the US Supreme Court decided *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857) and affirmed what various state courts had previously decided — that under the law, free (non-enslaved) black and brown people were not United States Citizens. Dred Scott.  The following year, the US Patent Office with support of the US Attorney General took action to enforce the law in a memorandum entitled "Invention of a Slave."  The memo begins with its clear statement: "A new and useful machine invented by a slave cannot be patented." Under Dred Scott, a non-enslaved people of color also lacked the requisite citizenship. https://patentlyo.com/patent/2020/06/invention-ongoing-movement.html

From the very first filings, pleadings, or complaint filed 05/01/2013 by the Plaintiff in the Court of Federal Claims Case No: 13-307C, all the Government, Apple, Samsung, LG, Qualcomm, the PTAB, the South Carolina District Courts needed to do was to show noninfringement of the alleged infringing products named in my pleadings, and/or prove on the standard of a "preponderance of evidence", and/or, the "clear and convincing evidence" standard, that my patents are invalid.

"In, *The Color of Creatorship*, law scholar Anjali Vats focuses on how racism has shaped intellectual-property systems. Patent, copyright and trademark laws and policies have, she argues, imagined whiteness and creatorship as synonymous while consistently devaluing the ingenuity of people of color. This is particularly pernicious because it is cloaked in technical legal language and in seemingly objective categories such as invention, novelty and infringement. So, it goes unchallenged, and shapes our understanding of who can participate in science, technology and markets — and how." https://www.nature.com/articles/d41586-020-03056-z

"After the abolition of slavery, many Black Americans held patents — including Lewis Latimer and Granville Woods, who worked on electricity and telegraphic communications. Yet, well into the twentieth century, racists used low rates of patenting to argue that people of color lacked ingenuity and could not fully participate in the US project of technological progress." https://www.nature.com/articles/d41586-020-03056-z

***Exhibit B describes Plaintiff's patented (product grouping) inventions for border security. (See Plaintiff's video on Facebook or website at atpg-tech.com)***

# APPLE MAINTAINS ITS MONOPOLY THROUGH THE UNREASONABLE METHODS OF "TYING TWO PRODUCTS TOGETHER" AND "CONTRIBUTORY INFRINGEMENT"

The FTC generally pursues anticompetitive conduct as violations of Section 5 of the Federal Trade Commission Act, which bans "unfair methods of competition" and "unfair or deceptive acts or practices." *Single Firm Conduct*: It is unlawful for a company to monopolize or attempt to monopolize trade, meaning a firm with market power cannot act to maintain or acquire a dominant position by excluding competitors or preventing new entry. It is important to note that it is not illegal for a company to have a monopoly, to charge "high prices," or to try to achieve a monopoly position by aggressive methods. A company violates the law only if it tries to maintain [] a monopoly through the unreasonable methods of "tying" two products together, and contributory infringement commencing from 35 U.S.C. § 271(c).

**"Tying" or "Bundling" Two Products Together**

Apple restricted third-party access to key technology, and apple abused its dominant position with the "tying" and "bundling" of plaintiff's patented CMDC devices, CPUs, & NFC technology. A description of the CMDC device, CPU, and NFC technology is below:

Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) device, or new and improved cell phone / smartphone is claimed by Plaintiff at: claims 1-9 of Plaintiff's '189 patent; claims 13-23 of Plaintiff's '439 patent; claims 4-6 of Plaintiff's '287 patent; and, claims 1-10 of Plaintiff's '619 patent.

"Computer Brain: Any modern computer, tablet, smartphone, network device or digital player has a central processing unit (CPU) — a general-purpose electronic-circuitry device for executing computer code" https://usa.kaspersky.com/blog/neuromorphic-processor-motive/26677/. "Your smartphone processor, also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the "brain" of the human body. Every action you perform on your smartphone goes straight to the processor" https://www.coolblue.nl /en/advice/smartphone-processors.html. "A CPU, or central processing unit, is like the "brain" of any computer or mobile device. CPUs receive data from every other part of the

device, and then decide how and when to launch apps, display images, and more. Most computers run on Intel or AMD CPU chips, although new Apple products use a custom CPU made by Apple" https://businessinsider.mx/what-is-a-cpu-a-guide-to-the-brain-of-your-computer-or-phone-including-how-it-works-9/

Plaintiff's patented Central Processing Unit, or CPU is claimed by Plaintiff at: claims 1, 2, & 3 of Plaintiff's '189 patent; claims 13, 14, 15, 22, & 23 of Plaintiff's '439 patent; claims 1-6 of Plaintiff's '287 patent; and, claims 1-20 of Plaintiff's '619 patent.

"The NFC Technology was first introduced into smartphones in September 2011 and is now widely integrated into most phones, whether they are iOS or Android based. An NFC-enabled smartphone uses an NFC controller chip connected to an NFC antenna. The controller chip can be defined as a specialized Central Processor Unit which accepts instructions provided by the application processor software and then processes those instructions to complete the NFC tag detection and/or reading NFC tag content." https://www.st.com/content/st_com/en/support/learning/essentials-and-insights/connectivity/nfc/nfc-and-mobile-devices.html

Plaintiff's patented Near-Field Communication, or NFC is claimed by Plaintiff at: claim 22 of Plaintiff's '439 patent; claims 1-6 of Plaintiff's '287 patent; and, claims 1, 5, 11, & 15 of Plaintiff's '619 patent.

"When a contactless payment is initiated (by a customer holding or tapping a mobile device to the payments terminal), the NFC technology goes to work. Using a specific frequency [] … the NFC-enabled reader and the smartphone pass encrypted information back and forth to each other to complete the payment." https://squareup.com/us/en/townsquare/nfc#:~:text=When%20a%20 contactless%20payment%20is,other%20to%20 complete%20the%20payment.

The European Commission, the European Union's executive arm: "We have indications that Apple restricted third-party access to key technology necessary to develop rival mobile wallet solutions on Apple's devices," stated European Commission Executive Vice President Margrethe Vestager. "In our Statement of Objections, we preliminarily found that Apple may have restricted competition, to the benefit of its own solution Apple Pay. If confirmed, such a

conduct would be illegal under our competition rules" … "Apple Pay is a digital wallet app from Apple that enables iOS users to make purchases online and at retail stores. In stores, the app allows users to make a purchase by holding their iPhone or iPad close to a payment terminal. Apple Pay provides this latter feature using a near-field communication, or NFC, chip built into iPhones and iPads" … "In 2020, the European Commission launched an antitrust investigation into Apple Pay" … "Antitrust officials have found that Apple "abused its dominant position in markets for mobile wallets on iOS devices." Third-party digital wallets can't provide the same capability because they have more limited access to the NFC chip in iPhones and iPads than Apple Pay, the European Commission determined" … "Apple could face fines equivalent to up to 10% of its annual worldwide revenue, which reached $378.35 billion last year" https://siliconangle.com/2022/05/02/eu-finds-apple-engaged-anticompetitive-practices-apple-pay/



Phone                                    Touchpoint

According to the European Commission, the European Union's executive arm: "Apple could face fines equivalent to up to 10% of its annual worldwide revenue, which reached $378.35 billion last year"; and, is equivalent to $37.835 billion dollars.

This injury is of the type the antitrust laws were intended to prevent; which makes the defendant's conduct unlawful.

The Antitrust injury imposed by Apple for violating Federal Antitrust Laws (Section 4 of the Clayton Act, 15 U.S.C.S. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue for treble damages, prejudgment interest, and costs of suit, including attorney fees.

Without authorization, a patent, or a license; Apple used Plaintiff's patented technology for CMDC devices; CPUs; and, NFC technology to generate hundreds of billions of dollars in

revenue. Apple has harm Plaintiff and the competitors within the targeted market. In effect, Apple has *unjustly enriched* itself to the tune of hundreds of billions of dollars.

**Contributory Infringement / Unjust Enrichment**

35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

35 U.S.C. § 271(d): "No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: … (3) sought to enforce his patent rights against infringement or contributory infringement;"

Contributory infringement requires: (1) knowledge of the infringed patent; (2) providing to a third party a material component of an infringing article; and (3) that the component is especially made or adapted for use in such infringing article. 35 U.S.C. § 271(c); *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1356 (Fed. Cir. 2018) ("[C]ontributory infringement requires knowledge of the patent in suit and knowledge of patent infringement." (quoting *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926 (2015)).

The doctrine of unjust enrichment allows a plaintiff to recover from a defendant, without the benefit of an enforceable contractual obligation, where the defendant has unfairly benefited from the plaintiff's efforts without compensation.

Plaintiff's claim for unjust enrichment requires the Plaintiff to show that: (1) Plaintiff conferred a benefit onto Apple; (2) Apple had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for Apple to retain the benefit without payment of its value.", *Platz Associates v. Finley*, 973 A.2d 743, 750 (2009). The unjust enrichment occurred when Party A (Plaintiff) conferred a benefit upon Party B (Apple) without Party A (Plaintiff) receiving the proper restitution required by law.

The knowledge requirement for both the alleged indirect (contributory) infringement and Plaintiff's alleged unjust enrichment claims is included at *(Dkt. 1)* of this complaint:

On 11/19/2010: Plaintiff's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Tim Cook, Chief Operating Officer (COO) of Apple, and Mr. Bruce Sewell, SVP & General Counsel; to 1 Infinite Loop, Cupertino, CA 95014. Apple received and signed for the letters 11/16/2010. Tracking Nos: 7009 2250 0001 0170 9861 and 7009 2250 0001 0170 9854.

In Plaintiff's notice letters; Plaintiff is quoted as saying "[m]y technology covers electronic devices, mobile devices, authentication (biometrics) technology; mobile devices lock and unlock features, RFID reader technology for mobile devices, embedded sensors in electronic devices, embedded sensors in mobile and portable devices, mobile phones as readers, embedded sensors in cell phone cases; mobile, electronic and portable devices used as monitoring equipment for locating, tracking, navigating and status of sensors."

On 07/01/2019, Plaintiff responded back to Apple's Krista Grewal, Counsel IP Transactions, on Plaintiff's "Cease and Desist" request. Plaintiff is quoted as saying:

➢ Certain Apple Inc.'s smartphones, laptops, tablets, and smartwatches are infringing at least one patent claim of PO's following patents: [7,385,497]; [7,636,033]; [8,106,752]; [8,334,761]; [8,531,280]; [RE43,891]; [RE43,990]; [9,096,189]; [9,589,439]; and, [10,163,287].

➢ Certainly, I appreciate the comment you made in defense of Apple's infringing activities in your last correspondence via email dated June 27, 2019: "As an example, no Apple product includes detectors or indicator lights for detecting "at least one of chemical, biological, radiological, or explosive" agents and compounds as required by the asserted patents."

➢ To address your comments above. Apple's smartphones; Apple's smartwatches; or Apple's smartphones interconnected to Apple's smartwatches; all, infringes at least one patent claim for a CMDC device(s) of the PO's patents listed above for chemical, biological, radiological, or explosive" agents and compounds. (Exhibit 1 for Chart Outline of Patent Claims)

➢ Apple has applied for patents for its smartphones and smartwatches that covers chemical and biological detection; biometric fingerprint and signature; motion sensors; and, the detection of humans. I expect Apple to submit to the USPTO an IDS to disclose my patents as prior art references for continued prosecution. If you fail to do so, I will seek to have the issued patents invalidated.

➢ Because Apple's smartphones; Apple's smartwatches; or Apple's smartphones interconnected to Apple's smartwatches infringes my CMDC device(s), I am demanding Apple "cease and desist" the manufacture, offer for sell, the sell, and the inducement of others to infringe my patented invention(s) (i.e., the government, the automobile industry, the medical industry, the home security industry, etc.)

On 03/31/2021; in the related case, COFC 13-307C, *Golden v. US*, Apple was issued a "NOTICE" by the Court to appear to defend its interest in the case.

Plaintiff, in the related case, COFC 13-307C, *Golden v. US*, identified ten alleged infringing products that Plaintiff believes infringes at least 25 independent claims of Plaintiff's patents asserted in the case [claim 1 of the '497 patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439 patent; and, claims 4-6 of the '287 patent]. An example of Apple's alleged infringement of at least 25 independent claims of Plaintiff's patents is attached.

Plaintiff satisfied the requirement for indirect (contributory) infringement of proving Apple's directly infringed Plaintiff's patents, in the related case, COFC 13-307C, *Golden v. US*, under 28 U.S.C. § 1498(a)—Government Infringement; and, 35 U.S.C. § 271(a))—Private Entity Infringement. The Claim Charts are included at *(Dkt. 1)* of this complaint.

When the United States served a summon on Apple Inc. to appear in the above referenced related case *Golden v. US*, Apple fail to appear to protect any interest Apple may have in the case. After nine (9) years; Granting Apple another chance to litigate non-infringement and patent validity will unfairly prejudice the Plaintiff.

Apple, and its co-conspirators waived their rights for later argument on patent invalidity and noninfringement for not participating in the § 1498 litigation, "[w]hile a contractor need not participate in the § 1498 litigation, contractors should be aware that failure to appear in response to a notice under Rule 14(b) acts as a waiver of any later argument that the contractor should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed." As the USCFC held in *Bowser, Inc. v. United States*:

> "We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him." 420 F.2d 1057, 1060 (Ct. Cl. 1970)

The Federal Circuit clarifies that there are two different tests for willfulness and enhanced damages. Willfulness is the lower standard of the two, and requires "no more than deliberate or intentional infringement." While enhanced damages flows from a finding of

willfulness it requires egregious conduct on the part of an infringer. <u>The conduct is measured from the date an adjudged infringer has notice of infringement.</u>

The US District for the Eastern Court of Texas in *Motiva Patents, LLC v. HTC Corporation*, E.D. Texas, 9:18-cv-00179 (Oct. 2019), ruled that having a policy of ignoring others' patents is sufficient grounds to support claims of willful patent infringement.

The Eastern District Court found HTC's policy of ignoring others' patents opened the door for support of Motiva's assertions that HTC willfully infringed upon Motiva's patents. The court stated that intentionally being blind to the facts was essentially the same as knowing about a competitor's patent and infringing on it anyway.

The basic principle of "ignorance of the law is no excuse" applies to patent infringement—as the defendant in a Texas patent case discovered.

Below are a list of Plaintiff's inventions Plaintiff claims Apple is allegedly responsible for contributing to the infringement of Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device. The charts are included to illustrate how the contributing products are "especially made" for use in an infringement of Plaintiff's patents for the CMDC device:

I.  Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone; laptop; tablet; etc.) – Claim 23 of the '439 Patent

   a. ***Central Processing Units for CMDC Device – Claim 5 of the '287 Patent***
   b. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent
   c. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent
   d. Embedded CBRN Sensors for CMDC Device – Claim 16 of the '439 Patent
   e. Interchangeable Sensors for CMDC Device – Claim 20 of the '439 Patent
   f. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent
   g. Remote/Electrical Lock for CMDC Device – Claim 125 of the '990 Patent
   h. Pre-Programmed Lock for CMDC Device – Claim 1 of the '287 Patent
   i. Fingerprint / Face Recognition for CMDC Device – Claim 1 of the '619 Patent
   j. Stall, Stop, Slowdown for CMDC Device – Claim 11 of the '891 Patent
   k. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent
   l. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent
   m. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent

## I. Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent



Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween …

**Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone)**

**Claim 23 of the '439 Patent**: "A cell phone comprising: a central processing unit (CPU) for executing and carrying out the instructions; … whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems … multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

"In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals

Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, …, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, … handhelds;

### a. *Central Processing Units (CPUs) for CMDC Device – Claim 5 of the '287 Patent*



Example: Claim 1 of the '619 Patent: A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of … processing instructions …

**Central Processing Units (CPUs) for CMDC devices**

**Claim 5 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to lock or unlock doors, send signals to control components of a vehicle, … or send signals to detect … chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

The "smartphone [laptop] processor (CPU), also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors. html. "[T]oday's smartphones [desktops] all have processors or CPUs. A smartphone [tablet] CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).

**b. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent**



**Camera CBR Sensor(s) for Smartphone**

Camera Sensor for Radiological Detection: How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app … works well enough to alert users to dangerous levels of radiation.

Camera Sensor for Biological Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera." (Image: Science at Cal).

Camera Sensor for Chemical Detection: The sensor **Rhevision** and UC San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can detect them; the phone's camera watches the chip for color changes.

**Claim 4 of the '189 Patent**: A built-in, embedded multi sensor detection system … sensor array or fixed detection device into the product that detects agents …

**c. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent**



Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/

**Smartwatch CBR Detector for Smartphone**

**Claim 19 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: a plurality of sensors … capable of being disposed within, on, upon or adjacent a multi-sensor detection device.

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

### d. Embedded CBRN Nanosensors for CMDC Device – Claim 16 of the '439 Patent



**Embedded CBRN Sensors for Smartphone (NASA)**

**Claim 16 of the '439 Patent**: A built-in, embedded multi sensor detection system … a cell phone, a smart phone

A silicon-based sensing chip, which consists of 64 nanosensors can turn a cell phone into a *portable poison detector*. NASA "can turn your cellphone into a *portable "silent killer" detector* https://www.foxnews.com/tech/smartphones-take-on-silent-killers-as-portable-danger-detectors & Nuclear Radiation Nanosensors and Nanosensory Systems https://link.springer.com/book/10.1007/978-94-017-7468-0

### e. Interchangeable Sensor Device for CMDC Device – Claim 20 of the '439 Patent



**Plurality of Interchangeable Sensor Device for Smartphone: (NASA & Subtractor George Yu)**

**Claim 20 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents…

The system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform. A cylinder that transmits data from sensors to smartphone. The NODE+ is compatible with Android and Apple smart devices.

### f. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent



MIT-- wirelessly detect hazardous gases by using a simple sensor made from near-field communication (NFC) tags that can be read by a smartphone… detect gaseous ammonia, hydrogen peroxide, and cyclohexanone, and other gases… Sensors. Retrieved from: https://phys.org/news/2014-12-cheap-sensor-transmit-hazardous-chemicals.html

**Near-Field Communication (NFC) CBR Tag for Smartphone (Safer than RFID tag)**

**Claim 21 of the '439 Patent**: A multi-sensor detection system … at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication

In November 2007, two Defense Department contractors, and a U.S. city's bomb squad demonstrated how an RFID tag could send a signal to … detonated a small amount of explosives in a container a simple emission of a radio signal traveling on the approved RFID 433 MHz frequency. Officials from the Defense Department and DHS observed the demonstration. https://www.nationaldefensemagazine.org/articles/2011/2/1/2011february-military-supply-chain-tracking-system-both-inefficient-and-dangerous

### g. Remote/Electrical Lock Disabler for CMDC Device – Claim 125 of the '990 Patent



**Remote/Electrical Lock Disabler for Smartphone (Gov. Contractor iControl's MATTs & mLOCK)**

**Claim 125 of the '990 Patent**: A multi-sensor detection system … whereupon detection causes a signal to be sent to the at least one communication device followed by communicating with the internal or external remote/electrical lock disabler.

Marine Asset Tag Tracking System (MATTS) is a DHS initiative for "Smart Container". MATTS "gateway": a wireless electronic device that communicates with a sensor array; the communication device; and locking mechanism for locking status and GPS location. Internal /external sensors are interconnected to operate with the MATTS device and can detect gas concentrations, radiation, humidity and moisture, atmospheric pressure, etc. The mLOCK communicates bi-directionally using encrypted messages between the lock and the MATTs readers or mobile devices (i.e., smartphone)

### h. Pre-Programmed Lock Disabler for CMDC Device – Claim 1 of the '287 Patent





"Monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock…"

**Pre-Programmed Lock Disabler for Smartphone**

Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android or iOS device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Account Login. On an Android or Apple Phone, multiple attempts (usually five attempts or more) with an unknown or a wrong pin will go either into a delay before further attempts are allowed …

FBI Failed Attempts to Unlock Phone: The FBI recovered an Apple iPhone 5C—owned by the San Bernardino County, California government—that had been issued to its employee Syed Rizwan Farook, one of the shooters involved in the December 2015 San Bernardino attack. The attack killed 14 people and seriously injured 22. The two attackers died four hours after the attack in a shootout with police … Authorities were able to recover Farook's work phone, but could not unlock its four-digit passcode, and the phone was programmed to automatically delete all its data after ten failed password attempts (an anti-theft measure on smartphones).

**Claim 1 of the '287 Patent**: Monitoring equipment that is at least one … a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

### i. Fingerprint and Face Recognition for CMDC Device – Claim 1 of the '619 Patent



**Fingerprint and Face Recognition for Smartphone**

**Claim 1 of the '619 Patent**: A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition

### j. Stall, Stop, or Vehicle Slowdown for CMDC Device – Claim 11 of the '891 Patent



Two security experts in the US have demonstrated taking control of two popular models of car, while someone else was driving them, using a laptop. said they hoped to raise awareness about the security issues around computer-dominated car control

**Stall, Stop, or Vehicle Slowdown for Laptop**

**Claim 11 of the '891 Patent**: A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising: at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

Remote Vehicle Shutdown is a system of remotely shutting down the connected vehicle, using radio pulses; intended for police, military and security use. Remotely find and disable stolen vehicles; ability to prevent engine start; prevent movement of a vehicle; stop or slow an operating vehicle; gradually decelerate a vehicle by downshifting, limiting the throttle capability; and, improve security of carriers of high-risk cargo, like hazardous materials. Security features that Remote Vehicle Shutdown provides. https://www.globenewswire.com/en/news - release/2019/12/17/1961557/0/en/Remote-Vehicle-Shutdown

### k. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent



**Autonomous and Driverless Vehicle Monitoring with Laptop**

**Claim 44 of the '891 Patent**: A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means ... (Dep. 55) ... 44, further can be adapted, modified or designed to include a vehicle designed to perform as a driverless or autonomous vehicle ... in operation with or without a user, driver or operator inside the vehicle.

**l. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent**



**Connect Vehicle with Smartphone**

**Claim 4 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to lock or unlock doors, send signals to control components of a vehicle, … or send signals to detect … chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

CarLink™ is a Smartphone interface that allows you to start your vehicle, unlock your doors or pop the trunk from virtually any distance, or help you find your car in a large garage after a sporting event or a trip to the mall. *Compatible with iPhone, BlackBerry and Android *Remote Start Compatible *Door lock and unlock *Car find feature (horn honk and/or flashing lights) *Control trunk release or sliding door open)

**m. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent**



The smartphone/laptop can be used as an IoT device for Personal emergency response, fitness tracking, location-based asset tracking, natural vision processing, and a Bluetooth gateway for wearable Bluetooth devices that enable many IoT monitoring apps. Also, identity verification, GPS based guidance, position/orientation awareness apps for smartphone/laptop-based implementation.

**Internet-of-Things (IoTs) with Smartphone/Laptop**

**Claim 11 of the '619 Patent**: A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device

The Internet-connected smartphones, can directly capture and compile data from as many as 14 different sensors: Accelerometer, GPS, Gyroscope, Magnetometer, Biometrics, Camera, Barometer, Proximity Sensors, Bluetooth connectivity, Barcode readers, Touchscreen sensors, Heart rate monitor, ECG, Haptic feedback sensors

The IoTs contain computing hardware, including processors with embedded programming telling them what to do, sensors that gather various sorts of readings (such as temperature, motion, chemical levels, heart rate and body movement) and communication hardware that can send and receive signals.

Apple fail to appear, after being issued notice, in the related case, COFC 13-307C, *Golden v. US*, to dispute or defend against Plaintiff's factually plausible infringement

contentions claims that the Apple products asserted in the case allegedly infringes Plaintiff's patents and patent claims.

Therefore, we need not move forward with addressing whether the Apple products directly infringed Plaintiff's patents; consideration should only be given to whether Apple has violated, with knowledge, 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

**Pursuant to FRCP Rule 56**:

Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to challenge Plaintiff's evidence of Apple's waiver for "failure to appear and defend" claim; Plaintiff's "contributory infringement" claim; Plaintiff's "willful infringement" claim; and, the resulting "unjust compensation" claims. Plaintiff is entitled to judgment as a matter of law.


## SUMMARY JUDGEMENT FOR APPLE'S UNJUST ENRICHMENT

**Antitrust Injury**

The elements of unjust enrichment exist for Apple because: 1) Plaintiff provided something of value to the defendant Apple; 2) Apple acknowledged, accepted and benefitted from what Plaintiff provided; and, 3) it would be inequitable for Apple to enjoy the benefit Plaintiff provided without compensating Plaintiff.

The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

Apple's collusion, exclusive arrangements, and conspiracy to hinder trade, has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CPUs. As a result of Apple's "systematic campaign" of illegal conduct to maintain its monopoly, with the

unauthorized use of Plaintiff's patented CMDC devices (new, and improved upon cell phones, smartphones); Apple has harmed Plaintiff, harmed competition, and unjustly enriched itself.

This injury is of the type the antitrust laws were intended to prevent; which makes the defendant's conduct unlawful.

Plaintiff believes Apple has unjustly enriched itself [the doctrine of unjust enrichment allows a plaintiff to recover from a defendant, without the benefit of an enforceable contractual obligation, where the defendant has unfairly benefited from the plaintiff's efforts without compensation].

Plaintiff has alleged Apple has, and is currently using Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices (i.e., "[a] communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products for communication therebetween, comprising…."; and, Plaintiff's central processing units (CPUs), i.e., the "brains" of the CMDC devices. No CMDC device—new, useful, or improved upon cell phones, smartphones—can function without at least one central processing unit (CPU).

**Apple's Forward Look and Actual Annual Revenues**
– *Data retrieved from macrotrends.net*

| | |
|---|---|
| 2026 | $365.817B |
| 2025 | $365.817B |
| 2024 | $365.817B |
| 2023 | $365.817B |
| 2022 | $365.817B |
| 2021 | $365.817B |
| 2020 | $274.515B |
| 2019 | $260.174B |
| 2018 | $265.595B |
| 2017 | $229.234B |
| 2016 | $215.639B |
| 2015 | $233.715B |
| 2014 | $182.795B |

**Apple's Forward Look and Actual Annual Revenues**
*– Data retrieved from macrotrends.net*

| | |
|---|---|
| 2013 | $170.910B |
| 2012 | $156.508B |
| 2011 | $108.249B |
| 2010 | $65.225B |
| **Total Revenue** | **$4,357.461B** |

Apple has had nine (9) years to present a patent(s) that proves Apple has patent rights to exclude others from making, using, selling, or offering for sale, a CMDC device of at least that of a smartphone, or new and improved cell phone. Apple has failed to produce evidence that Plaintiff's patents as invalid.

Plaintiff is entitled to stop Apple's use of the Plaintiff's inventions to generate hundreds of billions of dollars of dollars in revenue by seeking a legal injunction in Federal court. court.

Apple's anticompetitive practices has restrained Plaintiff from entering the market to collect royalties on his patented inventions. Plaintiff is entitled to collect damages for any unlicensed use of his inventions. Damages are generally calculated based on lost profits.

Pursuant to FRCP Rule 56: Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to prolong summary judgement in this case; and, no genuine dispute as to who own the patent rights for the CMDC devices Apple is unjustly enriching itself with. Plaintiff is entitled to judgment as a matter of law.

## SUMMARY JUDGEMENT ON THE VALIDITY OF PLAINTIFF'S PATENTS AND PATENT CLAIMS

Apple will want to be aware of the evolving law of estoppel, as it can have significant consequences. *In California Institute of Technology v. Broadcom Ltd.*, No. 16-cv-03714 (C.D. Cal.), for example, *Broadcom* could not pursue its litigation invalidity contentions due to petitioner estoppel. As a result, only infringement and damages were before the jury, which returned a verdict on Jan. 29, 2020, of infringement and awarded $1.1B in damages.

The Supreme Court's decision in *SAS Institute, Inc. v. Iancu*, 138 S.Ct. 1348 (2018) (*SAS*), made institution of IPR petitions an "all or nothing" game; an institution decision must be binary—either all challenged claims are instituted, or all are denied.

Which means either all of Plaintiff's patent claims [over 85] of all of Plaintiff's issued— presumed valid—patents [10], that covers Plaintiff's stall, stop, vehicle slowdown systems (i.e., Advanced Driver Assistance Systems ADASs)); Plaintiff's CMDC devices (i.e., new, useful, or improved upon cell phones; smartphones) must be instituted and found invalid.

Any *one* of Plaintiff's patent claims [over 85] that is not instituted, is recognized as being *valid* and can be used by Plaintiff to prove infringement. It is also unlikely Defendant will be able to prevail on the heightened standard of "clear and convincing" evidence in District Court that all of Plaintiff's patent claims [over 85] are invalid considering the extent of previous IPR review, re-issue prosecution; and, nine years of Government challenges at the U.S. Claims Court.

Plaintiff's patent specifications and patent claims was challenged at the USPTO in 2009-2021 on the grounds of 112 & 120. Plaintiff's patent specifications and patent claims was challenged at the USPTO-PTAB in 2014-2015 on the grounds of 101, 102, 112 & 120 [the 3 patent references that do not antedate Plaintiff's USPTO filing date; the 18 publications; and, the one Expert declaration submitted in the IPR were all submitted to the USPTO for prosecution examination in Plaintiff's '189, '439, '287, & '619 patents before the patents were issued].

Plaintiff's patent specifications and patent claims was challenged at the U. S. Court of Federal Claims in 2019-2021 on the grounds of 112 & 120. The USPTO patent prosecution history of references is attached as **Exhibit C**.

Pursuant to FRCP Rule 56: Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to challenge the validity of Plaintiff's patents and patent claims; no reason to prolong summary judgement in this case; and, no genuine dispute as to who own the patent rights for the CMDC devices Apple is unjustly enriching itself with. Plaintiff is entitled to judgment as a matter of law.

## **RELIEF**

A.  Summary judgement on the merits of the case for Apple's single-firm anticompetitive conduct (under section 2 of the Sherman Act), and unjust enrichment.

B. Summary judgement on the merits of the case for contributory infringement; and willful infringement.

C. Summary judgement on the merits of the history of Plaintiff's patent prosecution and challenges; that Plaintiff's patents and patent claims are valid.

D. Damages found or assessed for Apple's single-firm anticompetitive conduct (under Section 2 of the Sherman Act), that has cause Antitrust injury to the Plaintiff, in the amount of $25 billion dollars. $25B is only **.06%** of the total revenue ($4.357T) Apple received for the years 2010-2021, plus the projected amount Apple will receive for years 2022-2026.

E.  Damages found or assessed for contributory infringement that has cause injury to the Plaintiff, in the amount of $25 billion dollars. $25B is only **.06%** of the total revenue ($4.357T) Apple received for the years 2010-2021, plus the projected amount Apple will receive for years 2022-2026.

F. Trible damages for the Antitrust injury imposed by Apple for violating Federal Antitrust Laws (Section 4 of the Clayton Act, 15 U.S.C.S. § 15

G. The Court orders Apple to establish, at minimum, a $25 billion dollar reserve with the SEC for "Probability of the Incurrence of a Loss". The reserve is returned to Apple if found not liable.

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 6th day of September, 2022, a true and correct copy of the foregoing "Plaintiff's Response to Apple's Motion to Dismiss and Plaintiff's Cross-Motion for Summary Judgement", was served upon the following Defendant by priority "express" mail:

Jack P. DiCanio

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

525 University Avenue, Suite 1400

Palo Alto, California 94301

Phone: (650) 470-4500

Fax: (650) 470-4570

Email: jack.dicanio@skadden.com

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605